### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADVANCEMENT PROJECT, | |
| *Plaintiff*, | |
| v. | Case No. 1:19-cv-00052-RC |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| *Defendants*. | |

### ADVANCEMENT PROJECT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Advancement Project ("AP") hereby respectfully cross-moves for partial summary judgment against the U.S. Immigration and Customs Enforcement agency ("ICE") on the grounds that there is no genuine issue of disputed material fact, and the text of the Freedom of Information Act ("FOIA") and legal precedent establish that ICE is withholding responsive materials not subject to the claimed exemptions. In support of this Cross-Motion, AP provides a memorandum of law, a counter statement of material facts not in dispute, an exhibit responding to the claims made by ICE in its *Vaughn* index and a proposed order.

Dated: February 12, 2021

Respectfully submitted,

*/s/ Ian D. Volner*
Ian D. Volner, DC Bar #117309
IDVolner@venable.com
Venable LLP
600 Massachusetts Ave. NW
Washington, DC 20001

/s/ Losmin Jimenez
Losmin Jimenez, D.C. Bar #198691
Project Director and Senior Attorney
for Immigrant Justice
ADVANCEMENT PROJECT
1220 L Street, NW, Suite 850
Washington, DC 20005
Telephone: (202) 728-9557
LJimenez@advancementproject.org
*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ADVANCEMENT PROJECT,

                   *Plaintiff*,

         v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

                  *Defendants*.

Case No. 1:19-cv-00052-RC

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
ADVANCEMENT PROJECT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S MOTION
FOR SUMMARY JUDGMENT**

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 1

    I.    Procedural History ................................................................................................ 1

    II.   Immigration and Nationality Act § 243(d) and Visa Sanctions....................... 3

    III.  AP's Interest in the Visa Sanctions................................................................. 4

    IV.  Information AP Seeks ....................................................................................... 6

LEGAL STANDARD............................................................................................................ 7

ARGUMENT........................................................................................................................ 11

    I.    ICE Has Not Satisfied Its Burden to Show that the Deliberative Process
         Privilege Applies................................................................................................. 11

    II.   ICE Has Not Satisfied Its Burden to Show How the Disclosure Might
         Create a Risk of Circumvention of the Law ................................................... 12

    III.  ICE Has Failed to Comply with FOIA's Segregability Requirement........... 13

CONCLUSION..................................................................................................................... 14

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Immigration Council v. U.S. Dep't of Homeland Sec.*,
  950 F. Supp. 2d 221 (D.D.C. 2013) ...................................................................8, 10

*Arthur Anderson & Co. v. Internal Revenue Serv.*,
  679 F.2d 254 (D.C. Cir. 1982) ...............................................................................8

*Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*,
  334 F.3d 55 (D.C. Cir. 2003) .................................................................................7

*Blackwell v. Fed. Bureau of Investigation*,
  646 F.3d 37 (D.C. Cir. 2011) .................................................................................9

*Bloche v. Dep't of Def.*,
  370 F. Supp. 3d 40 (D.D.C. 2019) .........................................................................9

*Boyd. v. BATF*,
  Civ. No. 05-1096 (RMU), 2006 U.S. Dist. LEXIS 71857 (D.D.C. Sept. 29,
  2006) ....................................................................................................................10

*Budik v. Dep't of the Army*,
  742 F. Supp. 2d 20 (D.D.C. 2010) .........................................................................7

*Campaign Legal Ctr. v. U.S. Dep't of Justice*,
  Civ. No. 18-cv-1771 (TSC), 2020 U.S. Dist. LEXIS 95506 (D.D.C. June 1,
  2020) ...................................................................................................................7, 8

*Church of Scientology Int'l v. U.S. Dep't of Justice*,
  30 F.3d 224 (1st Cir. 1994) ..................................................................................13

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ............................................................................8, 9

*Detroit Free Press v. Ashcroft*,
  303 F.3d 681 (6th Cir. 2002) ...............................................................................14

*Dillon v. U.S. Dep't of Justice*,
  Civ. No. 17-1716 (RC), 2019 U.S. Dist. LEXIS 8055 (D.D.C. Jan. 17, 2019) ........7

*Elec. Frontier Found. v. U.S. Dep't of Justice*,
  826 F. Supp. 2d (D.D.C. 2011) ..............................................................................8

*Hussain v. U.S. Dep't of Homeland Sec.*,
  674 F. Supp. 2d 260 (D.D.C. 2009) .....................................................................10

*Island Film, S.A. v. Dep't of the Treasury,*
 869 F. Supp. 2d 123 (D.D.C. 2012) ............................................................10

*Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,*
 566 F.2d 242 (D.C. Cir. 1977) ..................................................................7

*NLRB v. Sears, Roebuck & Co.,*
 421 U.S. 132 (1975) ..................................................................................8

*Oglesby v. U.S. Dep't of the Army,*
 79 F.3d 1172 (D.C. Cir. 1996) ..................................................................7

*People for the Am. Way Found. v. U.S. Dep't of Educ.,*
 516 F. Supp. 2d 28 (D.D.C. 2007) ........................................................6, 7

*Petroleum Info. Corp. v. U.S. Dep't of Interior,*
 976 F.2d 1429 (D.C. Cir. 1992) ..........................................................7, 8, 9

*Pinson v. U.S. Dep't of Justice,*
 202 F. Supp. 3d (D.D.C. 2016) ..................................................................9

*Renegotiation Bd. V. Grumman Aircraft,*
 421 U.S. 168 (1975) ..................................................................................7

*Strunk v. U.S. Dep't of State,*
 845 F. Supp. 2d 38 (D.D.C. 2012) ..........................................................10

*Tax Analysts v. Internal Revenue Serv.,*
 294 F.3d 71 (D.C. Cir. 2002) ....................................................................8

*Weisberg v. U.S. Dep't of Justice,*
 705 F.2d 1344 (D.C. Cir. 1983) ................................................................7

**Rules & Statutes**

8 U.S.C.A. § 1253(d) ....................................................................................3

5 U.S.C. § 552(a)(4)(B) ................................................................................7

5 U.S.C. § 552(b) ....................................................................................9, 13

5 U.S.C. § 552(b)(7)(E) ................................................................................9

5 U.S.C. § 552(b)(9) ....................................................................................7

Fed. R. Civ. P. 56(a) ....................................................................................6

Freedom of Information Act ................................................................. *passim*

Immigration and Nationalization Act ........................................................................1, 3, 4

INA Section 243(d) .................................................................................................1, 3, 4

Visa Sanction Act ...........................................................................................................11

**Other Authorities**

Executive Order 13768 ....................................................................................................4

Executive Order on the Revision of Civil Immigration Enforcement Policies and
    Priorities, https://www.whitehouse.gov/briefing-room/presidential-
    actions/2021/01/20/executive-order-the-revision-of-civil-immigration-
    enforcement-policies-and-priorities/ (last visited Jan. 31, 2021) ...............................4

http://www.advancementproject.org ................................................................................4

https://advancementproject.org/resources/sanctioned-internal-documents-show-
    that-the-trump-administration-knew-about-the-devastating-impact-that-visa-
    sanctions-would-have-on-migrants-from-eritrea-and-cambodia/ ...............................5

https://undocublack.org/asdasd#:~:text=The%20UndocuBlack%20Network%20(
    UBN)%20is,and%20living%20our%20fullest%20lives ...........................................5

Jill H. Wilson, Immigration: "Recalcitrant" ...................................................................3

**INTRODUCTION**

The people of the United States, both citizens and immigrants, are the soul of this country. Enacted in 1952, the Immigration and Nationalization Act ("INA") is the foundation of immigration law. In recent years, however, the INA has been used for removal tactics as well as a barrier to entry of documented and undocumented immigrants without apparent or adequate justification or explanation. The issue in this action putatively taken pursuant to INA Section 243(d) were visa sanctions imposed upon foreign nationals from Cambodia, Eritrea, Guinea, and Sierra Leone. While there was a press release disclosing selective information about the imposition of sanctions and its consequences to nationals of these four countries, no information was provided as to why these four countries—three in sub-Saharan Africa, and one in Southeast Asia—were deemed "un co-operative" and therefore subject to sanctions. Plaintiff Advancement Project ("AP") filed the instant action against Defendant the U.S. Immigration and Customs Enforcement ("ICE"), among other federal agencies, for agency records pursuant to the Freedom of Information Act ("FOIA"). As AP shows in this memorandum, the information sought under FOIA will be used to further and protect the integrity in the administration of the INA and the legitimate interests of foreign nationals under International Treaties.

**BACKGROUND**

**I.    Procedural History**

The relevant procedural history in this case was stated in AP's Motion to Compel, *see* ECF No. 30, and can be summarized as follows:

On December 8, 2017, AP submitted FOIA requests to the Department of Homeland Security ("DHS"), the State Department ("State"), ICE, and the U.S. Customs and Border Protection ("CBP"). AP's FOIA requests generally sought records concerning DHS's and State's implementation of visa sanctions against four allegedly "uncooperative" countries—Cambodia,

Eritrea, Guinea, and Sierra Leone—in 2017.[1]   On September 27, 2018, ICE sent its "final response" to AP's FOIA requests, which stated that it "conducted a search of the ICE Office of Enforcement and Removal Operations ('ERO') for records responsive to your request and no records were found." ICE's "final response" also included the conclusionary statement that "an adequate search was conducted."

AP brought this action on January 10, 2019, alleging that DHS, State, and the U.S. Citizenship and Immigration Services failed to timely respond to its FOIA requests, and that ICE's response was inadequate. The filing of the lawsuit had some effect: On February 20, 2020, 13 months after the suit was filed, ICE sent AP its "tenth [and last] interim response," which concluded its releases with the exception of those records that require consultation with other agencies and/or components. ICE's production consisted of 1,723 pages, of which a significant portion were partially redacted and/or completely withheld.

On April 22, 2020, AP asked ICE to voluntarily produce a draft *Vaughn* index to help AP assess the withholdings' validity and to narrow the issues for summary judgment. AP did not request a draft index from the other defendants; AP had been informed that because of the COVID-19 pandemic, the State Department did not have access to the secure database on which its records were housed. On May 29, 2020, ICE produced a "Draft *Vaughn* index for Settlement Purposes Only." *See* ECF No. 30-1. On June 22, 2020, AP sent ICE's counsel a memorandum explaining its principal concerns based on information that AP counsel had found in the public record, which,

---

[1]     In its Declaration, ICE asserts that in its acknowledgement email sent to AP on December 11, 2017, it requested that AP resubmit its FOIA request and provide a reasonable description of the records sought, but that it "does not have any record of additional communications with Plaintiff" regarding this request. *See* ECF No. 45-3. This is simply incorrect. On March 12, 2018, AP sent via email correspondence a letter to the FOIA Officer that addressed ICE's allegations that the FOIA request was "too broad." *See* Exhibit D. Specifically, AP provided no less than six detailed search terms and parameters for the period of January 1, 2017 through November 30, 2017 to assist ICE with its obligation to conduct a reasonable search. *See* Statement of Undisputed Facts Response to item 2.

by its very nature of being within the public record, contradicted the various exemption positions ICE advanced in its draft *Vaughn* index. Given these contradictions, AP urged the government to "reconsider some of the claims made without the necessity of recourse to the Court." *See* ECF No. 30-1, ECF No. 30-3. On June 24, 2020, AP reminded ICE of the upcoming Joint Status Report due on June 30, 2020, and asked when it could expect a response to its June 22 memorandum. *See* ECF No. 30-1, ECF No. 30-4. The same day, ICE responded that it would "circulate something by Monday." *See* ECF No. 30-1, ECF No. 30-5. It did not.

Ultimately, on August 11, 2020, left with no other option, AP filed its Motion to Compel against ICE for a *Vaughn* index. *See* ECF No. 30. Since filing the Motion to Compel, the government has been reluctantly responsive. *See* ECF No. 38. On December 15, 2020, the parties filed a joint status report, and in relevant part, notified the Court of the parties agreed upon summary judgment briefing schedule. *See* ECF No. 42. ICE filed its Motion for Partial Summary judgment on January 15, 2021, and this Motion followed.

## II.       Immigration and Nationality Act § 243(d) and Visa Sanctions

Section 243(d) grants power to the Secretary of State to "discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of [the] country [at issue] until … the country [at issue] has accepted the alien." *See* 8 U.S.C.A. § 1253(d). This power, however, may not be invoked until the Secretary of Homeland Security has notified the Secretary of State that a foreign country has "denie[d] or unreasonably delay[ed]" acceptance of its "citizen, subject, national, or [country] resident…." *Id*.; *see* Jill H. Wilson, Congr. Rsch. Serv., IFI 1025, Immigration: "Recalcitrant" Countries and the Use of Visa Sanctions to Encourage Cooperation with Alien Removals, at 2 (2020) (attached as Exhibit C). Until 2001, this provision of the INA had remained dormant for nearly 50 years, only being used once, and after such use, remained dormant for another 15 years. Wilson at 2. Originally enacted to restrict visa issuances

to ex-Soviet nationals, visa sanctions were not used again until October 2016 against The Gambia when it purportedly did not cooperate with repatriation of its nationals. *Id.*

The prevalence of visa sanctions gained enforcement momentum and support in January 2017 with Executive Order 13768[2]. *See* Exec. Order No. 13768, 82 C.F.R. 8799 (2017). In relevant part, this executive order directed DHS and State to "effectively implement" sanctions provided by INA § 243(d) as well as added the requirement to ensure "diplomatic efforts and negotiations" were had with foreign countries. *Id.* Accordingly, in September 2017 visa sanctions were imposed on the countries at issue in this case for an alleged failure to establish reliable removal procedures. *Id.*

## III.     AP's Interest in the Visa Sanctions

AP has a manifest interest in the VISA Sanction Program. As stated at Paragraph 5 of the Complaint, AP is a non-profit, multi-racial civil rights organization whose mission is to fulfill America's promise of a caring, inclusive, and just democracy. AP provides legal, organizational, and communications support to grassroots organizations across the country in a variety of programs including, among others, the Immigration Justice Project. *See, e.g.,* Advancement Project, http://www.advancementproject.org (last visited Jan. 31, 2021).

Through the Immigrant Justice Project, AP has in the past worked with grassroots organizations on immigration detention and enforcement. In particular, it works closely with UndocuBlack Network, "a multigenerational network of currently and formerly undocumented Black people that fosters community, facilitates access to resources and contributes to

---

[2]     It should be noted, however, on January 20, 2021, Executive Order 13768 was revoked under the current White House administration, where revised guidance will be issued as appropriate. *See* Executive Order on the Revision of Civil Immigration Enforcement Policies and Priorities, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-the-revision-of-civil-immigration-enforcement-policies-and-priorities/ (last visited Jan. 31, 2021).

transforming the realities of our people, so we are thriving and living our fullest lives."
UnDocuBlack                                                                    Network,
https://undocublack.org/asdasd#:~:text=The%20UndocuBlack%20Network%20(UBN)%20is,and%20living%20our%20fullest%20lives (last visited Jan. 31, 2021). AP assisted UndocuBlack Network with its response to the DHS September 13, 2017 press release announcing visa sanctions against Cambodia, Sierra Leone, Guinea, and Eritrea that are the subject of this litigation. The Press Release is attached as Exhibit B. The Press Release of September 13 raised more issues than it resolved. In an effort to address these issues, Plaintiff began working on a FOIA request regarding the visa sanctions to Cambodia, Sierra Leone, Guinea, and Eritrea issued on September 13, 2017 that led to this lawsuit.

Despite the snail-like pace that the Government has pursued in this litigation, and the sweeping invocation of certain FOIA exemptions to redact large amounts of the material provided, the documents yielded information elevating concerns that the Government was violating human rights obligations by forcing deportations back to the sanctioned countries including Eritrea. *See* SANCTIONED: Trump Administration Dismissed International Law, Forced Deportation of Eritreans and Cambodians Who Face Torture, Death In Home Countries, Advancement Project, https://advancementproject.org/resources/sanctioned-internal-documents-show-that-the-trump-administration-knew-about-the-devastating-impact-that-visa-sanctions-would-have-on-migrants-from-eritrea-and-cambodia/ (last visited Jan. 31, 2021). Indeed, the information that AP has been able to gather has been put to use by lawyers representing deportees and potential deportees, and by the grass roots groups with which AP works with to pursue the common humanitarian goals that AP shares with these organizations and their constituents.

In sum, this litigation is neither a fishing expedition designed to expose a scandal for its own sake, nor has it been pursued despite the obstacles presented merely out of idle curiosity. On the contrary, this case seeks Government transparency in its dealings with the public for precisely the reasons that the Freedom of Information Act was enacted.

## IV.   Information AP Seeks

Although ICE has produced a very creditable *Vaughn* index, the description of the documents set forth makes very clear that except as to portions of some documents claimed as exempt under the Exemption 6 and 7(C), there is no valid legal or factual basis for the extensive redactions made. In Exhibit A, AP has replicated the *Vaughn* index document description verbatim and has set forth as to each document set a summary of the reasons that AP respectfully but strenuously urges that ICE's exemption claims be denied, except as to matters which AP has conceded are properly withheld as exempt.

The scope of the requests is deliberately and narrowly framed, as well as precise. As AP has asserted in previous filings, it does not seek documents claimed to be exempt under Exemption 6, or 7(C). Personally identifiable information ("PII") related to Government Officials engaged in the formulation of the Visa Sanction Program or its execution in relation to the four countries at issue here, or as to persons who have been embroiled in the sanction process is simply irrelevant to AP's mission and the reasons that it has filed this request. *See* Background, *supra* at 5–7. For the same reason, AP also does not seek disclosure of the portions of certain documents which ICE has—at the last minute and apparently in the course of preparing the Index—abruptly decided are now additionally exempt under Exemption 7(C). What AP is contesting are the claims of exemption advanced under Exemptions(s) 5 and/or 7(E.) We address these issues in turn.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, summary judgment is available to the defendant agency in a FOIA case only when the agency proves that it has fully discharged its obligations under the FOIA. *People for the Am. Way Found. v. U.S. Dep't of Educ.*, 516 F. Supp. 2d 28, 33 (D.D.C. 2007); *see also Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983).

Courts must conduct a *de novo* review of the record in ruling on a summary judgment motion in a FOIA case. 5 U.S.C. § 552(a)(4)(B). In the FOIA context, "*de novo* review requires [a] court to 'ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure.'" *Budik v. Dep't of the Army*, 742 F. Supp. 2d 20, 29 (D.D.C. 2010) (quoting *Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003)).

In addition, the agency must detail "what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977); *People for the Am. Way Found.*, 516 F. Supp. 2d at 34. Any non-exempt information that is reasonably segregable from the requested records must be disclosed. *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996); *see* 5 U.S.C. § 552(b)(9); *Dillon v. U.S. Dep't of Justice*, Civ. No. 17-1716 (RC), 2019 U.S. Dist. LEXIS 8055, at *25–26 (D.D.C. Jan. 17, 2019).

**<u>Exemption 5</u>**

The deliberative process privilege under Exemption 5 protects documents only if they are *both* pre-decisional and deliberative. *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citations omitted). A document is pre-decisional if it was "'prepared in order to assist an agency decisionmaker in arriving at his decision.'" *Id.* (quoting *Renegotiation Bd. V. Grumman Aircraft*, 421 U.S. 168, 184 (1975)). The "relevant decision in any given case is one that involves *discretion* about what an agency position or agency policy should be." *Campaign Legal Ctr. v. U.S. Dep't of Justice*, Civ. No. 18-cv-1771 (TSC), 2020 U.S. Dist. LEXIS 95506, at *19 (D.D.C. June 1, 2020) (emphasis added). Thus, final statements of agency policy or statements explaining actions already taken by an agency are not pre-decisional. *Tax Analysts v. Internal Revenue Serv.*, 294 F.3d 71, 80 (D.C. Cir. 2002); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151-52 (1975). For similar reasons, the thesis advanced by ICE that a final action may be subject to ongoing monitoring leaves the entire decisional process in the pre-decisional state finds no support in the FOIA. The September 2017 press release is a final agency action in the fullest sense of the term.

Nor are documents identified as "drafts" automatically considered pre-decisional. *Arthur Anderson & Co. v. Internal Revenue Serv.*, 679 F.2d 254, 257 (D.C. Cir. 1982); *Campaign Legal Ctr.*, 2020 U.S. Dist. LEXIS 95506, at *21 (documents "not used to help the agency make a decision, but rather used to communicate the decision" are not pre-decisional), *37 ("Because the relevant decision is [the agency's] *decision to issue the letter*, these drafts are not pre-decisional." (emphasis added)); *see also, e.g.*, *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 241 (D.D.C. 2013). The *drafts* that were "adopted, formally or informally, as the agency position on an issue" or "used by the agency in its dealings with the public" are not protected, as neither action involves the exposure of the withheld documents to the third parties.

*Arthur Andersen*, 679 F.2d at 257–58 (citation omitted); *accord, e.g.*, *Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d, 157, 170 (D.D.C. 2011).

Material is deliberative if it "'reflects the give-and-take of the consultative process.'" *Petroleum Info. Corp.*, 976 F.2d at 1434 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). To be deliberative, "materials must bear on the formulation or exercise of agency policy-oriented *judgment*." *Id.* at 1435 (emphasis in original) (citation omitted). Documents merely explaining agency regulations or "resource" opinions about the applicability of existing policy to a certain state of facts are not deliberative. *Coastal States*, 617 F.2d at 868. AP recognizes that some but by no means all of the material produced by ICE is deliberative but that, in itself, is not dispositive. *See Petroleum Info Corp.*, 976 F.2d at 1434. Indeed, to the degree that any portion of the documents describe the pre-decisional deliberations and give and take of the consultative process, which helped ICE reach its final agency opinion, ICE can readily, and therefore must, redact it. 5 U.S.C. § 552(b). But virtually all the deliberations ceased to be pre-decisional more than three years ago.

**Exemption 7(E)[3]**

Exemption 7(E) only protects "techniques and procedures for law enforcement investigations or prosecutions" or "guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). To satisfy its burden, the agency must satisfy two requirements. First, it must "establish a rational nexus between the investigation and one of the agency's law enforcement

---

[3]     ICE also has invoked Exemptions 6 and 7(C) to withhold certain responsive information. AP is not contesting ICE's redactions of the names and contact information of certain employees under Exemptions 6 and/or 7(C). *See* Dkt. No. 30 (AP's Motion to Compel ICE to Produce a *Vaughn* Index) at 6; *see also* Dkt. No. 45-1 at 5.

duties" as well as "a connection between an individual or incident and a possible security risk or violation of federal law." *Bloche v. Dep't of Def.*, 370 F. Supp. 3d 40, 58 (D.D.C. 2019) (quoting *Blackwell v. Fed. Bureau of Investigation*, 646 F.3d 37, 40 (D.C. Cir. 2011)). Second, it must "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Id.* (quoting *Blackwell*, 646 F.3d at 42); *Pinson v. U.S. Dep't of Justice*, 202 F. Supp. 3d at 104 (D.D.C. 2016) (denying 7(E) claims because the agency "has not explained the nexus between any information contained in the memorandum and the possible disclosure of investigatory or prosecutorial techniques").

To meet its burden, the agency must explain "why the release of the information would compromise law enforcement by, for example, revealing investigatory techniques that are not widely known to the general public" with at least some specificity. *Hussain v. U.S. Dep't of Homeland Sec.*, 674 F. Supp. 2d 260, 271 (D.D.C. 2009) (citation omitted). General descriptions such as "techniques involving consensual monitoring" or "investigative technique" alone are insufficient to justify withholding of documents under exemption 7(E). *Boyd. v. BATF*, Civ. No. 05-1096 (RMU), 2006 U.S. Dist. LEXIS 71857, at *30 (D.D.C. Sept. 29, 2006); *see, e.g.*, *Am. Immigration Council*, 950 F. Supp. 2d at 246; *Strunk v. U.S. Dep't of State*, 845 F. Supp. 2d 38, 47 (D.D.C. 2012). Similarly, the mere identification of databases the agency allegedly used in its investigations that do not reveal the agency's procedure for accessing such databases in the course of its investigation is not exempted under 7(E), even though the public is generally unaware of which databases the agency uses in its investigations. *Island Film, S.A. v. Dep't of the Treasury*, 869 F. Supp. 2d 123, 138 (D.D.C. 2012).

## ARGUMENT

**I.      ICE Has Not Satisfied Its Burden to Show that the Deliberative Process Privilege Applies**

The vast majority of the pages that have been wholly or partially redacted (mostly the former) are asserted to be "pre-decisional" and exempt under Exemption 5. Without exception each claim rests upon the propositions that the document was in "draft" and that disclosure would reveal the "deliberations," which, ICE suggests, sometimes never became final because these documents are subject to ongoing monitoring. *See* Ex. A. The fundamental problem with this position is that the mere designation of a deliberative set of documents as a "draft" is not nearly sufficient to bring the document within the scope of the deliberative process privilege of Exemption 5. As AP has shown, the agency action must be *both* deliberative and pre-decisional. Press Releases and drafts thereof, as well as messages to senior officials to help them do site visits and defend action determinations are not "deliberative".

The "relevant decision" in this case was the imposition of visa sanctions on the three sub-Saharan African and one Southeast Asian country that are the subjects of AP's Requests. That decision was announced publicly on September 13, 2017, through a press release issued by DHS and the press release was specifically referred to in AP's Request. Indeed, DHS did not merely publicly announce the decision; it purported to give a justification for the decision, right down to the exact number of people subject to removal from the US who had been convicted of a "serious" crime. Moreover, the Court may also take judicial notice of the "updated," January 2020 Congressional Research Bureau Report, which sets forth in broad and general terms the "factors" considered by ICE and DHS in advising the State Department to invoke the Visa Sanction Act. *See* Ex. C.

In short, the information that has been withheld is exactly the information which AP has been seeking for the past three plus years: (a) how were the "factors" presumably employed by the Government agencies in invoking visa sanctions against the four countries applied in these cases; (b) to what extent was consideration given to the decisions with respect to other countries against which sanctions were not invoked; and (c) what processes, if any, were these countries afforded to dispute the validity of the applicability of these "factors." To insist, as ICE does, nearly four years after the initial 2017 press release, that these questions are still "pre-decisional" makes questionable the public documents and seemingly nullifies the purpose of the exemption. All of the documents invoking Exemption 5 should be ordered released except those portions which are claimed exempt under Exemption 6, or 7(C).

## II.   ICE Has Not Satisfied Its Burden to Show How the Disclosure Might Create a Risk of Circumvention of the Law

ICE claims a limited number of documents or pages in documents are exempt solely on the basis of Exemption 7(E) while claiming others to be exempt through a combination of Exemptions 5 and 7(E), and in some cases, linked to Exemption 6. In its *Vaughn* index, ICE raises for the first time an issue with respect to "internal URLs." AP has stipulated that it is not interested in internal URLs, thus removing this issue from the dispute and as AP has made abundantly clear, the invocation of Exemption 6 or 7(C), is simply not at issue or in dispute. The only issue that ICE's invocation of Exemption 7(E) raises is whether redaction of the relevant information "risks circumvention of the law."

A valid claim under Exemption 7(E) involves more than the naked assertion made by ICE that law enforcement techniques may be disclosed. The Courts have made clear that there must be a specific identification between the individual or group as to whom information is sought and a

"nexus" to the law enforcement technique or method sought to be protected. Such a showing simply has not and cannot be made in this case.

The reason is simple. As AP has shown, the September 2017 press release not only provides a body count of the purported reasons for sanctions but also characterizes the nature of the crimes that the deportation targets are said to have been convicted of committing. Surely ICE is aware that conviction of a crime in the US is a matter of public record. Therefore, AP's inquiry as to the aggregate information regarding how these putative criminals were identified and how their alleged crimes were categorized can hardly be said to "risk" circumvention of the law. The convictions have already been obtained and the press release itself put the putative deportees on notice that sanctions had been imposed and that the deportees are subject to the risk of deportation to an "uncooperative" country.

In sum, the assertion of Exemption 7(E) is simply misguided. There is no attempt to explain at any level of specificity how the disclosure of the information compiled and summarized for the 2017 press release could enable anyone to learn how to "circumvent the law." As a result, there is no rational "nexus" between the information which ICE seeks to protect and any risk of circumvention of law or disclosure of sensitive law enforcement methods and techniques. ICE's invocation of Exemption 7(E) as an independent or co-dependent ground for withholding relevant information requested by AP does not meet the standards established above. Accordingly, unable to withstand judicial scrutiny, ICE's asserted exemption under 7(E) should be soundly rejected.

## III.    ICE Has Failed to Comply with FOIA's Segregability Requirement

FOIA requires that "all reasonably segregable, non-exempt portions of any agency records must, after deletion of the exempt material, be disclosed to a requester." *Church of Scientology Int'l v. U.S. Dep't of Justice*, 30 F.3d 224, 228 (1st Cir. 1994) (citation omitted); *see* 5 U.S.C. § 552(b). Thus, even if portions of the document are exempted from disclosure, they should be

13

redacted and produced. In the event that non-exempt portions are dispersed throughout the documents such that they cannot be produced in redacted form, the agency must explain why segregation would not be feasible. Clearly, ICE has done neither.

## CONCLUSION

There is one sense in which ICE is correct. The disclosure requested by AP will expose the Government to "risk". The risk is that disclosure of the information withheld by ICE may call into question the integrity and validity of the manner in which the visa sanction regime was invoked and applied in the case of these four countries. But that is simply not the sort of risk the exemptions from disclosure embodied in the Freedom of Information Act were ever intended to protect. On the contrary, "[d]emocracies die behind closed doors." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002). FOIA was enacted precisely to counteract the type of selective transparency engaged in by the Government in this case and to provide interested parties like AP with access to Governmental decisions and conduct so that, as warranted, corrective measures can be sought, and injuries redressed. AP's Motion for Summary Judgement should be granted.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 12th day of February, 2021, a copy of the foregoing was served via the Court's electronic filing system (ECF) on the following:

JOHNNY H. WALKER
Assistant United States Attorney
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
johnny.walker@usdoj.gov

*/s/ Ian D. Volner*
Ian D. Volner, DC Bar #117309
IDVolner@venable.com
Venable, LLP
600 Massachusetts Ave. NW
Washington, DC.20001




*/s/ Losmin Jimenez*
Losmin Jimenez, D.C. Bar #198691
Project Director and Senior Attorney
for Immigrant Justice
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, District of Columbia 20005
Telephone: (202) 728-9557
LJimenez@advancementproject.org

*Counsel for Plaintiff*
