**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| ADVANCEMENT PROJECT, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 19-52 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 45, 51 |
| | : | | |
| U.S. DEPARTMENT OF HOMELAND | : | | |
| SECURITY, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Frustrated with certain countries' refusal to cooperate with U.S. deportation efforts, the

Department of Homeland Security and State Department announced a series of visa sanctions.

The move prompted a Freedom of Information Act request from the Advancement Project, a

nonprofit with an interest in immigration policy.  The Project sought records from, among other

agencies, U.S. Immigration and Customs Enforcement.  After turning over some records and

withholding others, that agency says it has done all that the law requires.  The Court agrees—for

the most part.  When it comes to a handful of records, however, the Court needs more from the

agency before it can decide one way or the other.

## II.  BACKGROUND

The Immigration and Nationality Act permits the Secretary of Homeland Security and the

Secretary of State to issue visa sanctions against any country that "denies or unreasonably delays

accepting an alien who is a citizen, subject, national, or resident of that country."  8 U.S.C

§ 1253(d).[1]  Sanctions entail refusing to grant "immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of [the target] country."  *Id.*

Acting under that authority, the Department of Homeland Security and State Department levied visa sanctions against Cambodia, Eritrea, Guinea, and Sierra Leone.  Pl.'s Cross-Mot. Summ. J. and Opp'n ICE's Mot. Summ. J., Ex. B, ECF No. 51-4.  The press release announcing the sanctions explained that the four countries delayed issuing or refused to issue travel documents to their citizens, effectively rebuffing attempts by U.S. Immigration and Customs Enforcement ("ICE") to remove them.  *Id.*  Citing a Supreme Court decision barring the long-term detention of most noncitizens unless there is a "significant likelihood of removal in the reasonably foreseeable future," *id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001)), the press release asserted that the four countries' noncooperation "forced" ICE to let loose "thousands of dangerous criminals into communities across the United States," *id.*  It went on to provide, for each country, how many nationals ICE had released from detention or an approximate number of those residing in the United States subject to orders of removal.  *Id.*  It claimed that many of the noncitizens released had "serious criminal convictions," including convictions for sex offenses and violent offenses.  *Id.*

The Advancement Project—a nonprofit civil rights organization concerned with immigration policy—wanted more information than the press release gave.  It submitted Freedom of Information Act ("FOIA") requests for records about the visa sanctions to the Department of Homeland Security, the Department of State, U.S. Customs and Border

---

[1] The statute's text provides that visa sanction authority lies with the Secretary of State and the Attorney General.  *See* 8 U.S.C. § 1253(d).  But since the creation of the Department of Homeland Security, that agency's head has shared the authority with the Secretary of State.  *See* Rachel Canty, *The New World of Immigration Custody Determinations After* Zadvydas v. Davis, 18 Geo. Immigr. L.J. 467, 472 & n.36 (2004).

Protection, and ICE.  Pl.'s Resp. ICE's Statement Material Facts as to Which There Is No Genuine Issue ¶¶ 1–2, ECF No. 51-1.  This dispute centers on ICE's response.  ICE initially claimed that it had no relevant records.  *Id.* ¶ 7.  But after the Project brought this lawsuit, the agency produced 569 pages of records responsive to the request.  *Id.* ¶¶ 10–11.  ICE withheld some of those records in full and others in part under a variety of FOIA exemptions.  *See generally* Pineiro Decl., Ex. A ("ICE *Vaughn* Index"), ECF No. 45-3.

Arguing that it has met its FOIA obligations, ICE seeks summary judgment.  *See* Mem. P. & A. Supp. Mot. Summ. J. by ICE ("ICE's Mot."), ECF No. 45-1; *see also* Reply Supp. Mot. Summ. J. by ICE and Mem. P. & A. Opp'n Pl.'s Mot. Summ. J. ("ICE's Reply"), ECF No. 53.  It supports its motion with a declaration and a *Vaughn* index.  In the declaration, ICE's Acting FOIA Officer describes in general terms the information withheld and the agency's reasoning for applying exemptions.  *See generally* Pineiro Decl.  The *Vaughn* index provides the same descriptive information and reasoning on a record-by-record basis.  *See generally* ICE *Vaughn* Index.

The Advancement Project asks for summary judgment too.  It says that ICE withholds materials that do not fit within the exemptions the agency claims.  *See* Pl.'s Cross-Mot. Summ. J. and Opp'n ICE's Mot. Summ. J. ("Pl.'s Mot."), ECF No. 51; *see also* Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply"), ECF No. 56.  To support that argument, the Project produced a *Vaughn* index of its own.  Its index largely replicates ICE's but adds a column that disputes the exemptions the agency claims for each record.  *See generally* Pl.'s Mot., Ex. A ("Pl.'s Replicated *Vaughn* Index"), ECF No. 51-3.

By and large, ICE has the better of the argument.  It has adequately justified withholding most of the disputed records.  And as to the remainder, summary judgment is premature.  The

agency ought to have another opportunity to shore up its withholding explanations where they are currently lacking.  Accordingly, the Court grants in large part ICE's motion and denies the Advancement Project's motion.

### III.  LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  It "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the statute's nine exemptions."  *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)).  "Consistent with the Act's goal of broad disclosure," those exemptions should be "given a narrow compass."  *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).  "The agency bears the burden of establishing that a claimed exemption applies."  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).  And even if an exemption applies, the FOIA Improvement Act requires the agency to disclose an exempted record unless it can also show that it "reasonably foresees that disclosure would harm an interest protected by [the] exemption" or that "disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A)(i); *see also Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020).  In addition, an agency that properly claims an exemption must "demonstrate that it cannot segregate the exempt material from the non-exempt and disclose as much as possible."  *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 74 (D.D.C. 2003); *see also* 5 U.S.C. § 552(b).

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  In assessing whether the movant has met that burden, a court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence."  *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008).  Because FOIA cases do not ordinarily involve disputed facts, they "are typically and appropriately decided on motions for summary judgment."  *See Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009).  An agency may show that it is entitled to summary judgment by submitting affidavits that, in "reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Id.* (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).  An agency's justification for withholding records "is sufficient if it appears 'logical' or 'plausible.'"  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007)).

## IV.  ANALYSIS

ICE withheld records—some in part, others in full—under four exemptions.  Pineiro Decl. ¶ 16.  But the Advancement Project challenges the application of only two: Exemption 5 and Exemption 7(E).  *See id.* ¶ 18; Pl.'s Mot. at 6.  Examining each exemption in turn, the Court determines that ICE properly claimed at least one exemption for most of the records at issue.  Where that is not the case, the agency may try again to justify whichever exemption it says is applicable.  In addition, the agency has satisfied its obligation to segregate and disclose any nonexempt information from the records it properly withheld.

### A.  Exemption 5

FOIA's fifth exemption covers "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  Put differently, the exemption protects documents that would be privileged in ordinary civil litigation.  *See Loving*, 550 F.3d at 37.

ICE invokes the deliberative process privilege.  *See* Pineiro Decl. ¶ 22.  That executive privilege aims "[t]o protect agencies from being 'forced to operate in a fishbowl.'"  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (quoting *EPA v. Mink*, 410 U.S. 73, 87 (1973)).  In recognition "that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," the privilege "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *Id.* (first quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001); and then quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).

To fall under the deliberative process privilege, a document must be predecisional and deliberative.  *See id.* at 785–86; *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 512 (D.C. Cir. 2011).  "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made."  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975)).  It is deliberative if "it reflects the give-and-take of the consultative process."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  Together, the two requirements delineate between documents that set out a final agency decision and documents meant to help

the agency develop its position by expressing just the author's opinion.  *See Sierra Club*, 141 S.

Ct. at 786; *Coastal States*, 617 F.2d at 866.

ICE claims that the deliberative process privilege protects a variety of materials related to

the visa sanction decision.  Many of the documents it withholds consist of correspondence

between ICE's component offices discussing the possibility of sanctions.  *See* Pineiro Decl. ¶ 23.

Other records include emails and briefing documents relating to: meetings on agency strategy,

interviews with noncitizens to secure documentation to repatriate them, a draft plan and talking

points to manage media relations following the sanctions announcement, and analyses of

countries' cooperativeness in issuing travel documentation.  *See id.* ¶¶ 23–24.  In addition, ICE

says that many of the withheld records are merely draft documents.  *Id.* ¶ 28.  Those drafts—

many of which contain redline edits and comments—recommended sanctions for certain

countries, suggested responses to a nonprofit's inquiries, and briefed agency officials on the visa

sanction authority.  *Id.*  Some documents comprised a draft user guide for ICE's Removal

Cooperation Initiative Tool ("RCI Tool"), which uses a variety of factors to assess countries'

cooperativeness with U.S. repatriation efforts.  *Id.* ¶¶ 28, 36.

Before evaluating ICE's claims of privilege, the Court addresses two general objections

from the Advancement Project.  First, the Project suggests that many records are postdecisional

because they postdate the visa sanctions press release.  *See* Pl.'s Mot. at 11; Pl.'s Reply at 8–11;

*see also, e.g.*, Pl.'s Replicated *Vaughn* Index at 7.  But the deliberative process privilege's

application cannot be reduced to determining mechanically whether a record predates or

postdates a particular agency action.  Documents "dated after" one agency decision "may still be

predecisional and deliberative with respect to other, nonfinal agency policies." *Jud. Watch, Inc.*

*v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006); *see also Jud. Watch, Inc. v. U.S.*

*Dep't of Homeland Sec.*, 841 F. Supp. 2d 142, 162–63 (D.D.C. 2012).  And even documents relating to an already-adopted policy may be privileged if they "recount or reflect" predecisional discussions about that policy.  *Jud. Watch, Inc. v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13, 31 (D.D.C. 2011).  Consequently, the predecisional element does not require an agency to pinpoint a specific decision that chronologically follows the record's creation; it instead demands that the agency identify a decisionmaking process to which the record contributed.  *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1196 (D.C. Cir. 1991).  What matters is whether a record somehow "bear[s] on the formulation or exercise of agency policy-oriented judgment."  *Petroleum Info. Corp.*, 976 F.2d at 1435 (emphasis omitted).

Second, the Project asserts that any draft document whose position ICE ultimately approved cannot be predecisional.  *See* Pl.'s Mot. at 11–12; Pl.'s Reply at 11–12; *see also, e.g.*, Pl.'s Replicated *Vaughn* Index at 13–14.  "A draft is, by definition, a preliminary version of a piece of writing subject to feedback and change."  *Sierra Club*, 141 S. Ct. at 786.  Drafts thus "will typically be predecisional."  *Id.* at 788; *see also Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 161 F. Supp. 3d 120, 129–30 (D.D.C. 2016) (collecting cases in which "courts in this District have held . . . that drafts are protected by the deliberative process privilege").  Of course, something labeled "draft" is not automatically predecisional.  *See Sierra Club*, 141 S. Ct. at 786, 788; *see also Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257–58 (D.C. Cir. 1982).  A document is not predecisional when "an agency has hidden a functionally final decision in draft form."  *Sierra Club*, 141 S. Ct. at 788.  And "even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."  *Arthur Andersen*, 679 F.2d at 258 (quoting *Coastal States*, 617 F.2d at 866); *see also Sierra Club*, 141 S. Ct. at 786

(explaining that a draft document loses its privileged status when an agency "treats the document as its final view on the matter").

The Project says that ICE adopted the draft documents at issue here when it issued the visa sanctions. *See* Pl.'s Mot. at 11–12; Pl.'s Reply at 11–12; *see also, e.g.*, Pl.'s Replicated *Vaughn* Index at 13–14. But just "because the decisionmaker ultimately acted in accordance with the recommendation in a deliberative document" does not mean that the agency adopted the document. *See Jud. Watch, Inc. v. U.S. Dep't of Def.*, No. 14-cv-1935, 2016 WL 410993, at *3 (D.D.C. Feb. 2, 2016), *aff'd*, 847 F.3d 735 (D.C. Cir. 2017). "To adopt a deliberative document, . . . the agency must make an '*express*[]' choice to use a deliberative document as a source of agency guidance." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (quoting *Sears*, 421 U.S. at 161). It must not merely agree with the document's conclusions but also endorse the document's reasoning. *Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 10 (D.C. Cir. 2014). And significantly, the burden to prove adoption lies with the FOIA requester, not the agency. *See Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, No. 20-cv-172, 2021 WL 1167094, at *6 (D.D.C. Mar. 26, 2021); *Ball v. Bd. of Governors of Fed. Rsrv. Sys.*, 87 F. Supp. 3d 33, 52 (D.D.C. 2015). The Project points to no evidence of adoption other than ICE's high-level decision to enact visa sanctions. *See* Pl.'s Mot. at 11–12; Pl.'s Reply at 11–12; Pl.'s Replicated *Vaughn* Index at 13–14. That is not enough.

Having disposed of the Advancement Project's general objections, the Court determines that most of ICE's withholdings under Exemption 5 were proper. The majority of the withheld records consist of internal correspondence and draft documents evaluating whether to impose visa sanctions against different countries. *See, e.g.*, ICE *Vaughn* Index at 40 (summarizing an email as "discussing the possibility of proceeding with the visa sanctions process against a

country"); *id.* at 50 (explaining that a record included drafts of decision and action memoranda "regarding potential visa sanctions against Cambodia"). Those records are predecisional in that they were "prepared in order to assist an agency decisionmaker in arriving at his decision." *See Petroleum Info. Corp.*, 976 F.2d at 1434 (quoting *Renegotiation Bd.*, 421 U.S. at 184). As discussed, the fact that some postdated the sanction announcement does not necessarily indicate otherwise. Later-coming records appear to involve decisions the agency had yet to make. *See, e.g.*, ICE *Vaughn* Index at 35 (summarizing an email "regarding analysis and recommendations" for uncooperative countries that had become more cooperative); *id.* at 84 (describing drafts of "strategic plans pertaining to the path ICE may take in order to succeed in repatriating aliens" dated September 21, 2017). They contributed to an ongoing decisionmaking process that dealt with countries that refused to cooperate with ICE repatriation efforts. *See Access Reps.*, 926 F.2d at 1196–97; *see also Sears*, 421 U.S. at 151 n.18 ("Agencies are, and properly should be, engaged in a continuing process of examining their policies . . . .").

The records are largely deliberative too. They comprise "recommendations, draft documents, proposals, suggestions, and other subjective documents" that "reflect[] the give-and-take of the consultative process." *See Coastal States*, 617 F.2d at 866. These records do not represent "a final agency decision." *See Sierra Club*, 141 S. Ct. at 786. In fact, many of them cannot reflect the agency's position for the simple reason that they are products of subordinate ICE staff meant for senior officials' review or approval. *See Access Reps.*, 926 F.2d at 1195 ("A document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient."); *see also, e.g.* ICE *Vaughn* Index at 42 (summarizing an email from ICE's deputy chief of staff to the agency's chief of staff); *id.* at 76–

77 (describing a draft memorandum prepared by agency staff on behalf of the Acting ICE Director for transmission to the Secretary of Homeland Security).

Most of ICE's Exemption 5 withholdings thus fall within the bounds of the deliberative process privilege.  And for those records, ICE satisfied the FOIA Improvement Act's foreseeable harm requirement.  It reasonably concluded that disclosure would "discourage the expression of candid opinions" and "chill[] . . . intra- and inter-agency communications."  *See* Pineiro Decl. ¶ 27.  That is exactly the kind of harm Exemption 5 is meant to prevent.  *See Machado Amadis*, 971 F.3d at 371 (holding that an agency satisfied the foreseeable harm requirement by providing an affidavit stating that "'the information at issue' . . . 'would' chill future internal discussion"); *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 354–55 (D.D.C. 2018) (similar).  The Project does not argue otherwise.

A couple kinds of records deserve special mention.  The Advancement Project demands the release of records relating to ICE's strategy for communicating with the media about the visa sanctions.  *See* Pl.'s Reply at 3–5; *see also, e.g.*, Pl.'s Replicated *Vaughn* Index at 13–14.  It argues that those documents cannot be predecisional because they merely "justif[ied] and defend[ed]" a policy that the agency had already enacted.  *See* Pl.'s Reply at 4–5.  The argument is misplaced.  Determining how to explain an agency decision in response to inquiries from the press, Congress, or members of the public is itself a privileged deliberative process.  *See Reps. Comm. for Freedom of the Press v. FBI*, --- F. Supp. 3d ----, 2020 WL 1324397, at *7 (D.D.C. Mar. 20, 2020) (collecting cases supporting the proposition that documents "generated as part of a continuous process of decision making such as how to respond to on-going inquiries from the press or Congress . . . are predecisional and deliberative" (internal quotation marks and citation omitted)).  Presumably alluding to caselaw establishing that "[p]urely factual material usually

cannot be withheld under Exemption 5," *see Ancient Coin Collectors Guild*, 641 F.3d at 513, the

Project protests that it wants only the "factual predicates" behind the press release, Pl.'s Reply at

4.  But because an agency's public relations efforts "often require a prudent selection and

presentation of factual information," divulging even "facts" from ICE's communications plans

"would in all likelihood reveal the agency's deliberations about how to present those facts."  *See*

*Am. Ctr. for L. & Just. v. U.S. Dep't of State*, 330 F. Supp. 3d 293, 306 (D.D.C. 2018); *see also*

*Ancient Coin Collectors Guild*, 641 F.3d at 513 (explaining that an agency can withhold facts if

"the selection or organization of facts is part of [its] deliberative process").  ICE was entitled to

withhold documents created as it planned how to message the visa sanction decision in response

to inquiries from the media, *e.g.*, ICE *Vaughn* Index at 109, Congress, *id.* at 36–37, and an

interested nonprofit, *e.g.*, *id.* at 64.[2]

The parties also clash over several sets of briefing materials.  *See, e.g.*, Pl.'s Replicated

*Vaughn* Index at 21–22.  With some exceptions discussed below, most of the briefing materials

advised officials ahead of high-level meetings about how to handle countries that refused to

cooperate with U.S. repatriation efforts.  *See, e.g.*, ICE *Vaughn* Index at 28 (summarizing

documents compiled to prepare ICE's Acting Director for an "upcoming Recalcitrant Countries

briefing"); *id.* at 32 (describing "proposed talking points for a meeting between ICE Leadership

and the Acting Secretary" of Homeland Security).  The Project asserts that these documents

communicated a decision rather than helped ICE make a decision.  *See* Pl.'s Reply at 11–12.  But

---

[2] Notably, the public relations documents the Advancement Project seeks are drafts or consultative communications.  They are not "final talking points provided to an agency decisionmaker for actual use in making a public statement," which a judge in this district recently held fall outside the scope of the deliberative process privilege.  *See Ecological Rts. Found. v. U.S. EPA*, --- F. Supp. 3d ----, 2021 WL 535725, at *19 (D.D.C. Feb. 13, 2021), *vacated on other grounds*, 2021 WL 2209380 (D.D.C. June 1, 2021).

that is simply not true.  The briefing materials provided senior officials with subordinates'

analyses and recommendations before meetings where participants hashed out decisions.  *See,*

*e.g.*, ICE *Vaughn* Index at 28 (explaining that briefing materials for ICE's Acting Director

included the drafter's opinions, analysis, and recommendations regarding ICE's repatriation

efforts); *id.* at 38 (describing documents briefing ICE's Director for a meeting on the RCI Tool

as containing "the drafter's opinions and analysis on those countries that were removed from the

RCI Uncooperative List"); *see also Access Reps.*, 926 F.2d at 1195.  Based on the materials'

content and the way ICE officials used them, there is little question that they are predecisional

and deliberative.  *See Elec. Frontier Found. v. U.S. Dep't of Just.*, 890 F. Supp. 2d 35, 51–53

(D.D.C. 2012) (holding that briefing materials prepared for senior policy officials at the

Department of Justice who met for high-level negotiations with European Union officials were

privileged); *see also Ctr. for Biological Diversity v. U.S. EPA*, 369 F. Supp. 3d 1, 23–25 (D.D.C.

2019) (holding that the deliberative process privilege protected an "informal paper for EPA staff

to prepare for a meeting," an "internal annotated agenda for a briefing of the Assistant

Administrator," "talking points and background for EPA staff to prepare for a meeting," and an

"internal status report for a briefing of the Assistant Administrator").  And once again, even facts

from the briefing materials are protected under the deliberative process privilege.  Preparing

them required agency staff to "exercise their judgment by anticipating what information [senior

ICE] officials would need" to make intelligent decisions about the issues plaguing ICE's

repatriation efforts.  *See Elec. Frontier Found.*, 890 F. Supp. 2d at 53 (alteration omitted).

     Although ICE adequately justified most of its withholdings under Exemption 5, it failed

to do so for a few records.  Two such records include documents that ICE describes as draft

documents but whose file names include the word "final."  *See* ICE *Vaughn* Index at 92–94

(record number 2019-ICLI-00015 – 265–66); *id.* at 124–26 (record number 2019-ICLI-00015 –

428–44).  ICE says that, despite the file names' use of the word "final," the documents are

predecisional because staff sent them as drafts to senior officials for review and approval.  *See id.*

at 93, 125; Pl.'s Reply at 10.  Otherwise, the agency simply describes the records as "internal

documents" discussing repatriation efforts and proposed visa sanctions against various countries.

*See* ICE *Vaughn* Index at 124–25; *see also id.* at 92–93.  Given that the file names suggest the

documents are final, more is required of ICE if it expects to withhold them because they are

drafts.  *See* ICE's Reply at 6; *see also Moore*, 601 F. Supp. 2d at 12 (explaining that an agency

can earn summary judgment when its affidavits show that "the information withheld logically

falls within the claimed exemption, *and are not controverted by . . . contrary evidence in the*

*record*" (emphasis added) (citation omitted)).  As the Advancement Project points out, ICE does

not mention another "final" version of these documents or explain what the results of official

review ultimately were.  *See* Pl.'s Reply at 12.  The documents may thus be "functionally final"

because they received approval and concluded the drafting process, or they could be

recommendations that "died on the vine" without securing decisionmakers' approval.  *See Sierra*

*Club*, 141 S. Ct. at 788.  The Court cannot tell.  ICE must therefore provide additional detail.[3]

---

[3] Two other sets of draft documents explain ICE's role in imposing visa sanctions under
the Immigration and Nationality Act.  *See* ICE *Vaughn* Index at 106–09 (record number 2019-
ICLI-00015 – 323–25); *id.* at 115 (pages 393 and 394 of record number 2019-ICLI-00015 – 393–
97).  It is not apparent from ICE's affidavits how these "internal briefing and background
documents," ICE's Mot. at 11, "contributed to a deliberative process within the agency," *Access*
*Reps.*, 926 F.2d at 1196.  And although both documents are drafts, even drafts must relate to
some policy-related decisionmaking process.  *See Competitive Enter. Inst.*, 161 F. Supp. 3d at
130 (citing *Vaughn v. Rosen*, 523 F.2d 1136, 1143–44 (D.C. Cir. 1975); *Petroleum Info. Corp.*,
976 F.2d at 1435).  Nevertheless, the Court will hold later that Exemption 7(E) immunizes these
records from disclosure because they contain information about the agency's RCI Tool.

The agency must do more to withhold a pair of briefing documents too.  One document aimed to prepare ICE's Acting Director for a visit to the border.  *See* ICE Vaughn Index at 25–27 (record number 2019-ICLI-00015 – 406–19).  The other consisted of "internal talking points" on "a number of ICE initiatives" and was "part of a briefing book for the Secretary of Homeland Security's nomination."  *See id.* at 122–24 (record number 2019-ICLI-00015 – 424–26).  How those documents "bear on the formulation or exercise of agency policy-oriented judgment" is not obvious.  *See Petroleum Info. Corp.*, 976 F.2d at 1435 (emphasis omitted).  And ICE's descriptions suggest that the documents were not "prepared in order to assist an agency decisionmaker in arriving at his decision" but rather to explain decisions "already made."  *See id.* at 1434 (quoting *Renegotiation Bd.*, 421 U.S. at 184).  Perhaps that is not the case.  If so, the agency must make that clear.[4]

The last record ICE failed to justify withholding under Exemption 5 is an email.  ICE describes it as discussing "interviews that will and are taking place for Cambodians and citizens of other countries in order to obtain travel documentation and repatriate these individuals."  ICE *Vaughn* Index at 17 (record number 2019-ICLI-00015 – 299).  The agency says that the email "provides an analysis and general overview" of the interviews, *id.* at 18, but it does not identify a decisionmaking process the email contributed to or explain how the email's contents helped the agency in that process.  It has thus failed to demonstrate that the deliberative process privilege protects the email.

---

[4] While ICE also claims that Exemption 7(E) protects these two records from disclosure, the agency has not justified that exemption's application either.  *See infra* section IV.B.2 (determining that ICE failed to identify what law enforcement technique, procedure, or guideline that releasing these records would disclose).

In sum, ICE has adequately justified most of its withholdings under Exemption 5.  Where it has fallen short, however, summary judgment is premature.  The agency may submit supplementary affidavits to make its case as to the records that remain in dispute.

## B.  Exemption 7(E)

Exemption 7(E) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  A record must therefore meet three requirements to qualify for the exemption.  First, it must have been "compiled for law enforcement purposes."  *Id.*  That means that the record was "created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption."  *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex. ("PEER")*, 740 F.3d 195, 203 (D.C. Cir. 2014).  Second, the release of the record must disclose techniques, procedures, or guidelines used for law enforcement investigations or prosecutions.  5 U.S.C. § 552(b)(7)(E).  Third, it must be that the disclosure of those techniques, procedures, or guidelines "could reasonably be expected to risk circumvention of the law."  *Id.*[5]  In other words, disclosure "might increase the risk 'that a law

---

[5] According to D.C. Circuit caselaw, an Exemption 7(E) claimant must show a risk of circumvention of the law regardless of whether a law enforcement technique, procedure, or guideline is at stake.  *See PEER*, 740 F.3d at 204 n.4 (remarking that, unlike the Second Circuit, the D.C. Circuit has applied the "risk of circumvention" requirement to techniques and procedures in addition to guidelines); *Shapiro v. U.S. Dep't of Just.*, 239 F. Supp. 3d 100, 119 (D.D.C. 2017) (similar); *see also Blackwell v. FBI*, 646 F.3d 37, 41–42 (D.C. Cir. 2011) (approving the withholding of records discussing law enforcement techniques and procedures after determining that their release would create a risk of circumvention of the law).

will be violated or that past violators will escape legal consequences.'" *PEER*, 740 F.3d at 205

(quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)).

ICE groups its withholdings under Exemption 7(E) into three sets.  One set consists of

information related to ICE's internal databases and computer systems.  Pineiro Decl. ¶ 33.  The

omitted material describes the steps ICE officers take to manage cases in those systems and

includes screenshots.  *Id.*[6]  Another set contains details about "ongoing and proposed operations

and investigations" and contract detention facilities.  *Id.* ¶ 34.  The withheld information includes

staffing levels, bed space capacity in a detention facility, and the locations and purposes of

agency operations.  *Id.*  The last set of withheld records pertains to the agency's RCI Tool.  *Id.*

¶ 35.  Remember, the RCI Tool uses a series of factors to identify how cooperative a country is

with ICE repatriation efforts.  *Id.* ¶ 36.  This set of records contains the Tool's assessment of

countries' compliance with ICE repatriation efforts, actions that federal agencies took to

encourage compliance from those countries, and a draft RCI User Guide.  *Id.* ¶ 35.

At the outset, it is worth clearing up a misconception that the Advancement Project

harbors about Exemption 7(E).  The Project suggests (in less than clear terms) that an agency's

ability to withhold information under the exemption is related to the extent of its authority to

enforce criminal laws.  *See* Pl.'s Replicated *Vaughn* Index at 1–2, 17–18; Pl.'s Reply at 13.  At

one point, it goes so far as to argue that "ICE does not have authority to enforce criminal

---

In addition, the "could reasonably be expected to risk" language supplants the FOIA
Improvement Act's general requirement than an agency must disclose records unless it is
reasonably foreseeable that disclosure would harm the interest the claimed exemption protects.
*See Reps. Comm. for Freedom of the Press v. FBI*, No. 17-cv-1701, 2021 WL 2913078, at *6 &
n.2 (D.D.C. July 12, 2021); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*,
--- F. Supp. 3d ----, 2021 WL 950415, at *6 & n.4 (D.D.C. Mar. 12, 2021).

[6] Some redactions in this group of records omit "law enforcement sensitive system
URLs."  Pineiro Decl. ¶ 33.  The Advancement Project does not challenge those redactions.  *See*
Pl.'s Mot. at 12; *see also, e.g.*, Pl.'s Replicated *Vaughn* Index at 3.

statutes," so the agency's "claim that disclosure of the information sought will reveal 'guidelines for law enforcement' is baseless." Pl.'s Replicated *Vaughn* Index at 2. The argument misses the mark in at least two ways. As a factual matter, ICE does enforce federal criminal laws. *See, e.g.*, 8 U.S.C. § 1357(a)(5) (describing immigration officers' authority to make arrests); *Myrick v. Johnson*, 199 F. Supp. 3d 120, 124 (D.D.C. 2016) (explaining that ICE's Homeland Security Investigations component is "tasked with investigating a wide range of criminal activity"). And more fundamentally, Exemption 7(E) protects records relating to the enforcement of not just criminal laws but civil laws too. *PEER*, 740 F.3d at 203 ("The term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal.").

The Court now turns to Exemption 7(E)'s three requirements.

1. Were the Withheld Records Compiled for Law Enforcement Purposes?

ICE must first show that the records it withholds were compiled for law enforcement purposes. Evaluating whether it has made that showing begins with classifying the agency. An agency whose "principal function is law enforcement" is entitled to deference when it claims that records were compiled for law enforcement purposes. *See id.*; *see also Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982) (explaining that "a court can accept less exacting proof" about the purpose of records when the agency's "principal mission" is to enforce the law). By contrast, an agency with "mixed law enforcement and administrative functions" must describe the records with enough specificity to satisfy a skeptical court's scrutiny. *See PEER*, 740 F.3d at 203; *see also Pratt*, 673 F.2d at 418 (declaring that, when dealing with "a mixed-function agency," "a court must scrutinize with some skepticism the particular purpose claimed for disputed documents"). The difference in treatment arises from the default presumption that agencies ordinarily "act within the scope of their legislated authority." *Pratt*, 673 F.2d at 418. A mixed-

function agency must do more to convince a court that records were compiled for law

enforcement purposes because "other functions are . . . a major part of the agency's day-to-day

business." *Id.*  ICE's central mission is to enforce immigration law, so its claims about the

purpose of withheld records deserve deference.  *See, e.g.*, *Roseberry-Andrews v. Dep't of

Homeland Sec.*, 299 F. Supp. 3d 9, 31 (D.D.C. 2018) ("[T]his Court concludes, consistent with

many other decisions in this Circuit, that ICE is a law enforcement agency."); *see also* Pl.'s

Reply at 5 (conceding the point).

  Notwithstanding that backdrop of deference, ICE must still demonstrate that the records

at issue were compiled for law enforcement purposes.  After all, "not every document compiled

by a law enforcement agency is compiled for a law enforcement purpose."  *100Reporters LLC v.

U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 159 (D.D.C. 2017).  Even a law enforcement agency

must establish that (1) a withheld record's creation was "related to the enforcement of federal

laws or to the maintenance of national security" and (2) the nexus between the record's creation

and the agency's law enforcement duties is "based on information sufficient to support at least 'a

colorable claim' of its rationality."  *Pinson v. U.S. Dep't of Just.*, 202 F. Supp. 3d 86, 102

(D.D.C. 2016) (quoting *Pratt*, 673 F.2d at 420–21).  Notably, a record may be compiled for law

enforcement purposes even if it "relat[es] to guidelines, techniques, and procedures for law

enforcement investigations and prosecutions outside of the context of a specific investigation."

*Tax Analysts v. IRS*, 294 F.3d 71, 78 (D.C. Cir. 2002).

  Affording ICE due deference, the Court holds that all the records the agency withheld

under Exemption 7(E) were compiled for law enforcement purposes.  Documents in the first set

of records include communications instructing ICE personnel how to use case management

systems and screenshots from those systems.  *See* Pineiro Decl. ¶ 33; *see also, e.g.*, ICE *Vaughn*

Index at 2, 9.  The systems help ICE "deport[] people who are unlawfully in the United States,"

so records meant to shed light on them for ICE personnel have a clear and plausible connection

to the agency's law enforcement duties.  *See Long v. Immigr. & Customs Enf't*, 149 F. Supp. 3d

39, 49 (D.D.C. 2015) ("[R]ecords concerning how [ICE] databases are constructed and how they

operate . . . . easily qualify as records or information 'compiled for law enforcement

purposes.'"); *see also Roseberry-Andrews*, 299 F. Supp. 3d at 33 (collecting cases reaching the

same conclusion).  ICE staff assembled the second set of records to brief decisionmakers on

agency operations and facilities.  *See* Pineiro Decl. ¶ 34; *see also, e.g.*, ICE *Vaughn* Index at 25,

122.  The connection between ICE's law enforcement duties and records created to manage its

efforts to detain and remove noncitizens is self-evident.  Finally, the third set of records

describes how the RCI Tool works.  *See* Pineiro Decl. ¶¶ 35–36; *see also, e.g.*, ICE *Vaughn*

Index at 28–30.  Because the Tool informs ICE's strategy for repatriating noncitizens subject to

orders of removal, these records have an obvious and well-supported connection to the agency's

law enforcement duties too.

### 2.  Would the Withheld Information Disclose Law Enforcement Techniques, Procedures, or Guidelines?

Having established that the three sets of records were compiled for law enforcement

purposes, ICE must now show that their release would disclose law enforcement techniques,

procedures, or guidelines.  Exemption 7(E) "does not ordinarily protect 'routine techniques and

procedures already well known to the public.'"  *Elec. Frontier Found. v. Dep't of Just.*, 384 F.

Supp. 3d 1, 9–10 (D.D.C. 2019) (quoting *Founding Church of Scientology of Wash., D.C. v.

NSA*, 610 F.2d 824, 832 n.67 (D.C. Cir. 1979)).  But it does cover the "confidential details" of

techniques, procedures, and guidelines even when their "general contours [are] publicly known."

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1112 (D.C. Cir. 2007) (citing *Blanton v. Dep't of Just.*, 64 F. App'x 787, 788–89 (D.C. Cir. 2003) (per curiam)); *see also Shapiro v. U.S. Dep't of Just.*, 893 F.3d 796, 801 (D.C. Cir. 2018).

ICE has demonstrated that at least two of the kinds of records it withholds would reveal law enforcement techniques, procedures, or guidelines.  It explains that some records describe the "procedural steps" officials take to use internal case management systems or consist of screenshots depicting those systems.  *See* Pineiro Decl. ¶ 33; *see also, e.g.*, ICE *Vaughn* Index at 2–3.  ICE's internal methods of managing, collecting, and organizing law enforcement data qualify as techniques, procedures, or guidelines for the purposes of Exemption 7(E).  *See Blackwell*, 646 F.3d at 169 (holding that Exemption 7(E) applied to an agency's "methods of data collection, organization and presentation"); *Long*, 149 F. Supp. 3d at 50 ("[I]nternal database codes, fields, and other types of identifiers used by law enforcement agencies to conduct, organize, and manage investigations and prosecutions qualify, at least, as law enforcement guidelines, if not also law enforcement methods and techniques.").

The records discussing the RCI Tool satisfy Exemption 7(E)'s second requirement too. ICE uses the Tool to gauge countries' cooperativeness with its efforts to enforce immigration law and respond accordingly.  *See* Pineiro Decl. ¶¶ 35–36; *see also, e.g.*, ICE *Vaughn* Index at 132–34.  There is thus little question that the Tool is a law enforcement technique or guideline. Nevertheless, the Advancement Project complains that release of the records would reveal nothing because the factors the Tool considers are already public knowledge.  *See* Pl.'s Reply at 13–14.  It points to a congressional report highlighting some—but not all—of those factors.  *See* Pl.'s Mot., Ex. C at 1, ECF No. 51-5 (explaining that ICE assesses countries' cooperativeness "based on statistical data and expert analytic feedback on a range of assessment factors," then

listing some of the factors that assessment "include[s]").  As explained earlier, however,

Exemption 7(E) still protects the "confidential details" of techniques, procedures, and guidelines

"whose general contours [are] publicly known."  *Sussman*, 494 F.3d at 1112.  And ICE assures

the Court that those sorts of details are exactly what it withholds here.  *See* Pineiro Decl. ¶ 36

(describing the withholdings as including information "not well known to the public," such as

"the specific factors that go into ICE's assessment" and "how [cooperation] scores are

calculated").  Absent some concrete indication of bad faith, an agency declarant's representations

should usually be accepted as true.  *See Moore*, 601 F. Supp. 2d at 13.  The Court therefore

determines that releasing records detailing how the RCI Tool works would reveal the

confidential details of a law enforcement technique or guideline.  *Cf. Kalu v. IRS*, 159 F. Supp.

3d 16, 22–23 (D.D.C. 2016) (approving the withholding of information that the FBI said could

shed light on the criteria for putting individuals on the No-Fly List).

 While ICE has explained how the release of two sets of records would divulge law

enforcement techniques, procedures, or guidelines, it has failed to do so with respect to the

remaining set.  Recall that the last group of records contains information about "ongoing and

proposed operations and investigations" and ICE detention facilities.  *See* Pineiro Decl. ¶ 34; *see

also, e.g.*, ICE *Vaughn* Index at 25–27.  ICE says that the withheld information "includes the

location of an operation, the purpose of the operation, who is being targeted, whether it is a joint

venture between other federal or state and local agencies, [and] the number of staff and bed

space in a detention facility."  Pineiro Decl. ¶ 34.  But releasing those pieces of information

would not necessarily reveal anything about a law enforcement technique, procedure, or

guideline.  Or at least, if it would, ICE has not spelled out how.  Instead of offering any specifics,

the agency merely states that releasing the records "could" reveal law enforcement techniques, procedures, or guidelines.  *Id.*; *see also, e.g.*, ICE *Vaughn* Index at 27.

That is not enough.  An agency cannot justify an Exemption 7(E) withholding by offering a "near-verbatim recitation of the statutory standard" that does nothing to explain "what procedures are at stake" or "how disclosure [of the withheld records] could reveal such procedures."  *See Citizens for Resp. & Ethics in Wash.*, 746 F.3d at 1102.  ICE "must at least provide *some* explanation of what procedures are involved and how they would be disclosed." *Id.*; *see also Kolbusz v. FBI*, No. 17-cv-319, 2021 WL 1845352, at *23 (D.D.C. Feb. 17, 2021) ("[T]he government must provide sufficient facts and context to allow the reviewing court to 'deduce something of the nature of the techniques in question.'" (citation omitted)).  So although one can imagine that releasing this group of records could reveal law enforcement techniques, procedures, or guidelines, ICE has not demonstrated that summary judgment is warranted yet. *See Citizens for Resp. & Ethics in Wash.*, 746 F.3d at 1102 (denying agency summary judgment when it merely "cite[d] Exemption 7(E) 'to protect procedures and techniques used by FBI [agents] during the investigation'" (second alteration in original)); *Whittaker v. U.S. Dep't of Just.*, No. 18-cv-01434, 2019 WL 2569915, at *3 (D.D.C. June 21, 2019) (denying agency summary judgment because its affidavit "d[id] not make clear with reasonable specificity what procedures are involved and how they would be disclosed" (internal quotation marks omitted) (citations omitted)).  The agency can try again to justify withholding the two records in this group that do not otherwise enjoy Exemption 5's protection.  *See* ICE *Vaughn* Index at 25–27 (record number 2019-ICLI-00015 – 406–19); *id.* at 122–24 (record number 2019-ICLI-00015 – 424–26).

3.   Could Disclosure Risk Circumvention of the Law?

Exemption 7(E)'s last requirement is that disclosure of information about the law

enforcement technique, procedure, or guideline "could reasonably be expected to risk

circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The exemption's language "sets a

relatively low bar for the agency to justify withholding."  *Blackwell*, 646 F.3d at 42.  It

> looks not just for circumvention of the law, but for a risk of circumvention; not
> just for an actual or certain risk of circumvention, but for an expected risk; not
> just for an undeniably or universally expected risk, but for a reasonably expected
> risk; and not just for certitude of a reasonably expected risk, but for the chance of
> a reasonably expected risk.

*Mayer Brown*, 562 F.3d at 1193.  All an agency must do is "demonstrate[] logically how the

release of [the requested] information might create a risk of circumvention of the law."  *Id.* at

1194 (alterations in original) (quoting *PHE, Inc. v. Dep't of Just.*, 983 F.2d 248, 251 (D.C. Cir.

1993)).

ICE has done that—at least for the two sets of records that remain live issues.  With

respect to the records related to ICE's internal case management systems, the agency asserts that

a wrongdoer could misuse information to breach its systems and alter or delete data.  Pineiro

Decl. ¶ 33.  The Court agrees.  Wrongdoers may well abuse information that provides insight

into law enforcement systems.  *See Parker v. U.S. Immigr. & Customs Enf't*, 238 F. Supp. 3d 89,

100 (D.D.C. 2017) (concluding that the disclosure of information ICE used to "store and index

data" could "create a risk of circumvention by revealing how ICE's databases work and

rendering them more vulnerable to manipulation"); *Ortiz v. U.S. Dep't of Just.*, 67 F. Supp. 3d

109, 124 (D.D.C. 2014) (approving ICE's assertion that the disclosure of records relating to an

internal system would allow wrongdoers to "navigate the law enforcement system and

compromise the integrity of the data either by deleting or altering information").

Likewise, ICE has shown how releasing records related to the RCI Tool would logically lead to circumvention of the law.  It explains that making public the factors it considers when assessing a country's cooperativeness could encourage countries to game or contest its assessments.  Pineiro Decl. ¶ 36.  The agency says that could result in delays in repatriating noncitizens who are subject to removal orders.  *Id.*  Its account makes sense.  Countries have significant incentives not to be judged "recalcitrant" by ICE and its RCI Tool.  Uncooperative countries may face diplomatic pressure, the withholding of funding and aid, or visa sanctions.  *See* Pl.'s Mot., Ex. C at 2.  It is thus plausible that uncooperative countries could try to avoid those consequences by resisting an unfavorable assessment rather than genuinely work to improve repatriation efforts.

The Advancement Project's counterargument is unconvincing.  It asserts that the information it seeks—information about the crime-related numbers provided in the visa sanctions press release—cannot risk circumvention of the law because criminal convictions are already matters of public record.  *See* Pl.'s Mot. at 13; *see also, e.g.*, Pl.'s Replicated *Vaughn* Index at 1–2.  But the argument misunderstands how FOIA works.  There is a difference between the information a FOIA plaintiff seeks and the information actually contained in the records responsive to its request.  The applicability of a FOIA exemption depends on the latter.  Regardless of what information the Project wants, ICE has adequately explained how the information in its responsive records could result in circumvention of the law.

All in all, ICE may withhold under Exemption 7(E) the records related to the agency's computer systems and the RCI Tool.  It will have another chance to explain why the last set of records—which deal with agency operations and facilities—should fall under the exemption's protection.  At this juncture, however, the agency has failed to explain what law enforcement

techniques, procedures, or guidelines the release of those records would reveal.  If it can provide

a satisfactory explanation on that point, it will likely be able to clear the "low bar" posed by the

circumvention-of-law requirement.  *See Roseberry-Andrews*, 299 F. Supp. 3d at 33 (agreeing that

releasing records would "reveal information about the type, scope, and location of an

investigation" and thus could allow wrongdoers "to take proactive steps to counter operational

and investigative actions taken by ICE").  But there is no need to make that assessment now.

### C.  Segregability

Lastly, an agency must release any reasonably segregable portion of a record after

removing exempt portions.  5 U.S.C. § 552(b).  Only if nonexempt portions are "inextricably

intertwined with exempt portions" can the agency withhold the entire record.  *Johnson v. Exec.*

*Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Cent., Inc. v. U.S.*

*Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)).  The agency may establish that it

satisfied the segregability requirement by providing a "detailed justification" as to why the

withheld records cannot be segregated further.  *Id.* (quoting *Mead Data Cent.*, 566 F.2d at 261).

It is presumed to have complied with the segregability requirement unless the FOIA requester

points to evidence indicating otherwise.  *Sussman*, 494 F.3d at 1117.  In that case, the agency

bears the burden of showing that it has not withheld any segregable, nonexempt portions.  *Id.*

ICE has met its segregability obligations.  It produced a detailed *Vaughn* index that

describes each of the records it withheld along with corresponding exemptions.  *See* ICE *Vaughn*

Index.  Agency staff conducted a "line-by-line review" of withheld records to ensure that ICE

had turned over all segregable, nonexempt information.  *See* Pineiro Decl. ¶¶ 39–40.  And ICE's

declarant maintains that the agency "did not withhold any non-exempt information on the

grounds that it was non-segregable." *Id.* ¶ 40.  The Advancement Project briefly attacks ICE's

segregability justification as insufficiently detailed.  *See* Pl.'s Reply at 6–8.  But given the presumption in the agency's favor and the detail of its *Vaughn* index, ICE's representations about segregability are enough.  *See Abdelfattah v. U.S. Immigr. & Customs Enf't*, 851 F. Supp. 2d 141, 146 (D.D.C. 2012) (holding that ICE met its segregability obligations when it conducted a line-by-line review of withheld records, produced a detailed *Vaughn* index, and provided an affidavit justifying its withholdings); *see also Ortiz*, 67 F. Supp. 3d at 125 (similar).  For the records ICE properly withheld, it does not need to segregate out and disclose additional portions.

## V.  CONCLUSION

For the foregoing reasons, ICE's motion for summary judgment (ECF No. 45) is **GRANTED IN PART AND DENIED IN PART** and the Advancement Project's motion for summary judgment (ECF No. 51) is **DENIED.**  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: July 19, 2021                                      RUDOLPH CONTRERAS
                                                         United States District Judge