## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ADVANCEMENT PROJECT, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 19-52 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 64, 68 |
| | : | | |
| U.S. DEPARTMENT OF HOMELAND | : | | |
| SECURITY, *et al.*, | : | | |
| | : | | |
| Defendant. | : | | |

### MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANT DEPARTMENT OF STATE'S MOTION FOR SUMMARY JUDGMENT;
GRANTING IN PART AND DENYING IN PART DEFENDANT IMMIGRATION AND CUSTOMS
ENFORCEMENT'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

This Freedom of Information Act ("FOIA") case arises out of Plaintiff Advancement

Project's ("the Project") suit against Defendants Immigration and Customs Enforcement ("ICE")

and the Department of State ("State").  In a previous opinion by this Court, involving the claims

only against ICE, this Court granted ICE's motion for summary judgment as to most of its

withholdings but demanded ICE say more to justify the remainder.  *See Advancement Project v.

U.S. Dep't of Homeland Sec.*, 549 F. Supp. 3d 128, 133–34 (D.D.C. 2021).  Now before the

Court is Defendants' motion for summary judgment and Plaintiff's cross-motion for summary

judgment.  The Court must examine the remainder of ICE's withholdings that it previously failed

to adequately justify, in addition to all of State's withholdings, which are before this Court for

the first time.  This Court finds that ICE has now successfully justified its Exemption 5

withholdings.  But ICE has failed to properly explain its segregability analysis for the documents

it has claimed "died on the vine" and withheld under Exemption 5, and therefore needs to

provide more detail confirming that no non-exempt information can be properly segregated from that which is properly withheld.  Defs.' Mot. at 22; ICE *Vaughn* Index at 92–94, *Advancement Project*, 549 F. Supp. 3d 128 (D.D.C. 2021), ECF No. 45-3 (record number 2019-ICLI-00015-265-66); *id.* at 124–26 (record number 2019-ICLI-00015-428-44).[1]  With respect to State, the Court finds that it has properly justified all of its withholdings.  Therefore, besides allowing ICE another chance to explain its Exemption 5 segregability analysis for the documents that ICE claimed "died on the vine," the Court will grant summary judgment to the Defendants on all the other withholdings.

## II.  BACKGROUND

The background to this case is largely the same as it was when this Court issued its previous opinion in this dispute.  *See Advancement Project*, 549 F. Supp. 3d at 134–35.  To recap, the Immigration and Nationality Act permits the Secretary of the Department of Homeland Security ("DHS") and the Secretary of State to issue visa sanctions against any country that "denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country."  8 U.S.C. § 1253(d).[2]  Sanctions entail refusing to grant "immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of [the target] country."  *Id.*  Acting under this authority, DHS and State issued a press release announcing sanctions against four countries.  *Advancement Project*, 549 F. Supp. 3d at 134.  The Project—a nonprofit civil rights organization concerned with immigration policy—wanted more

_____

[1] ICE relies on the same *Vaughn* index that it submitted in the last round of litigation. *See* Ex. A to Pineiro Decl., ECF No. 45-3.

[2] The statute's text provides that visa sanction authority lies with the Secretary of State and the Attorney General.  *See* 8 U.S.C. § 1253(d).  But since the creation of the Department of Homeland Security, that agency's head has shared the authority with the Secretary of State.  *See* Rachel Canty, *The New World of Immigration Custody Determinations After* Zadvydas v. Davis, 18 Geo. Immigr. L.J. 467, 472 & n.36 (2004).

information than the press release gave.  *Id.*  The Project submitted FOIA requests for records about the visa sanctions to the DHS, U.S. Customs and Border Protection ("CBP"), ICE, and State.  Pl.'s Resp. ICE's Statement Material Facts as to Which There Is No Genuine Issue ¶¶ 1–2, ECF No. 51-1.

The Court's previous opinion granted summary judgment for ICE on most of ICE's withholdings.  *Advancement Project*, 549 F. Supp. 3d at 135, 148.  With respect to several sets of records, however, it ruled that ICE needed to say more to justify its withholdings.  *Id.* at 140–41, 145–46.  Two sets of these records, still at issue now, comprise: (1) two records that include "documents that ICE describes as draft documents but whose file names include the word 'final,'" *id.* at 140–41; ICE *Vaughn* Index at 92–94 (record number 2019-ICLI-00015-265-66); *id.* at 124–26 (record number 2019-ICLI-00015-428-44); and (2) "a pair of briefing documents" concerning, respectively, (a) preparations for ICE's Acting Director's visit to the border which contains information, *inter alia*, about "staffing levels" and "detention capacity for facilities in Arizona," ICE *Vaughn* Index at 25–27 (record number 2019-ICLI-00015-406-19), and (b) "'internal talking points' on 'a number of ICE initiatives' that were 'part of a briefing book for the Secretary of Homeland Security's nomination'" which contains "information pertaining to law enforcement sensitive operations and investigations as well as a proposed operation not yet in place.," *id.* at 122–24 (record number 2019-ICLI-00015-424-26).[3]  ICE's Acting FOIA Officer has produced a second declaration expanding on ICE's prior justifications for withholding these records.  *See* 2d Pineiro Decl., ECF No. 64-4.  Both ICE and the Project now seek summary

---

[3] Because there are no records at issue for which ICE claims Exemption 7(E) and not Exemption 5 and because, as described below, the Court will grant ICE summary judgment based solely on ICE's Exemption 5 claims, the Court does not reach ICE's overlapping Exemption 7(E) claims.  ICE *Vaughn* Index at 25–27, 122–26.

judgment on these remaining records.  *See* Mem. P. & A. Supp. Mot. Summ. J. by State & Renewed Mot. Summ. J. by ICE ("Defs.' Mot."), ECF No. 64-1; Pl.'s Cross-Mot. Summ. J. and Opp'n State's Mot. Summ. J. & ICE's Renewed Mot. Summ. J. ("Pl.'s Cross-Mot."), ECF No. 67.[4]

This dispute now also involves State.  In 2017, the Project submitted a FOIA request to State.  Pl.'s Resp. State's Statement Material Facts as to Which There Is No Genuine Issue ¶ 1, ECF 67-1.  From May 2019 to September 2020, State made nine productions of non-exempt information responsive to the Project's original FOIA request.  *Id.* ¶ 5.  After a period in which State made no further productions, the Project narrowed its request.  *Id.* ¶¶ 5–6.  State located 34 records responsive to the Project's narrowed request, releasing 12 in full and 22 in part.  *Id.* ¶ 7. Arguing that it has met its FOIA obligations, State seeks summary judgment.  *See* Defs.' Mot.; *see also* Opp'n Pl.'s Mot. Summ. J. & Reply Supp. Defs.' Mot. Summ. J. ("Defs.' Reply"), ECF No. 70.  It supports its motion with a declaration and a *Vaughn* index.  In the declaration, State's Director of the Office of Information Programs and Services describes in general terms the information withheld and the agency's reasoning for applying exemptions.  *See generally* Stein Decl., ECF No. 64-3.  The *Vaughn* index provides the same descriptive information and reasoning on a record-by-record basis.  *See generally* Stein Decl., Ex. 1 ("State *Vaughn* Index"), ECF No. 64-3.  The Project asks for summary judgment too.  It says that State withholds materials that do not fit within the exemptions the agency claims.  *See* Pl.'s Cross-Mot; Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply"), ECF No. 72.  The cross-motions are now ripe for decision.

---

[4] ICE has now released some records that the previous opinion concluded was lacking sufficient justification for withholding, and so they are no longer part of this dispute.  *See* ICE *Vaughn* Index at 17; Defs.' Mot. at 22 n.1; *Advancement Project*, 549 F. Supp. 3d at 141–42.

### III.  LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  It "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the statute's nine exemptions." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)).  "Consistent with the Act's goal of broad disclosure," those exemptions should be "given a narrow compass." *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).  "The agency bears the burden of establishing that a claimed exemption applies." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).  And even if an exemption applies, the FOIA Improvement Act requires the agency to disclose an exempted record unless it can also show that it "reasonably foresees that disclosure would harm an interest protected by [the] exemption" or that "disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A)(i); *see also Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020).  In addition, an agency that properly claims an exemption must "demonstrate that it cannot segregate the exempt material from the non-exempt and disclose as much as possible." *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 74 (D.D.C. 2003); *see also* 5 U.S.C. § 552(b).

Because FOIA cases do not ordinarily involve disputed facts, they "are typically and appropriately decided on motions for summary judgment."  *See Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In assessing whether the movant has met that burden, a court "must

view the evidence in the light most favorable to the nonmoving party, draw all reasonable

inferences in his favor, and eschew making credibility determinations or weighing the evidence."

*Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008).  "This burden does not shift even

when the requester files a cross-motion for summary judgment because 'the Government

ultimately has the onus of proving that the documents are exempt from disclosure.'"  *Hardy v.

ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health

Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).  An agency may show that it is

entitled to summary judgment by submitting affidavits that, in "reasonably specific detail,

demonstrate that the information withheld logically falls within the claimed exemption, and are

not controverted by either contrary evidence in the record nor by evidence of agency bad faith."

*Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).  An agency's

justification for withholding records "is sufficient if it appears 'logical' or 'plausible.'"  *Larson,*

565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007)).

## IV.  ANALYSIS

The Court will examine the Project's dispute with each agency in turn.  The only

remaining issue in the Project's suit against ICE is whether ICE has sufficiently supplemented its

earlier reasoning for certain withholdings under Exemption 5.  *See Advancement Project*, 549 F.

Supp. 3d at 140–41.  As described in detail below, the Court concludes that ICE has now

properly justified withholding information under Exemption 5.  However, ICE has not justified

its segregability analysis with respect to all the documents withheld under Exemption 5.  The

Court will give ICE another chance to justify its Exemption 5 segregability analysis for the

documents ICE has claimed "died on the vine" and withheld under Exemption 5.  Defs.' Mot. at

22; ICE *Vaughn* Index at 92–94 (record number 2019-ICLI-00015-265-66); *id.* at 124–26 (record

number 2019-ICLI-00015-428-44).  With respect to these documents, the Court will order *in camera* review and give ICE an opportunity to renew its motion for summary judgment.

With respect to State, the Project challenges State's withholdings of certain documents under Exemptions 5 or 7(E).  Pl.'s Cross-Mot. at 7–8.  State has properly justified both its Exemption 5 and Exemption 7(E) claims, so the Court grants State summary judgment.  In addition, State has satisfied its obligation to segregate and disclose any nonexempt information from the records it properly withheld.

## A.  ICE

### 1.  Exemption 5

FOIA Exemption 5 covers "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Put differently, the exemption protects documents that would be privileged in ordinary civil litigation.  *See Loving*, 550 F.3d at 37.

ICE invokes the deliberative process privilege.  *See* 2d Pineiro Decl. ¶ 8.  The deliberative process privilege aims "[t]o protect agencies from being 'forced to operate in a fishbowl.'"  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (quoting *EPA v. Mink*, 410 U.S. 73, 87 (1973)).  In recognition "that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," the privilege "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Id.* (first quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001); and then quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).  To fall under the deliberative process privilege, a document must be predecisional and

deliberative.  *See id.* at 785–86; *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 512 (D.C. Cir. 2011).  "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made."  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft Engr. Corp.*, 421 U.S. 168, 184 (1975)).  A document can still be predecisional even if it postdates a particular agency decision, so long as the document concerns "agency choices about what rationales, justifications, and limitations to provide—and which to leave out—in articulating an important agency decision," because "[d]ebate and discussion about such statements precede—are predecisional to—the actual determination of how best both to define the scope and contours of the new policy, and to persuasively communicate its terms and rationale to the public."  *Campaign Legal Ctr. v. U.S. Dep't of Just.*, 34 F.4th 14, 24 (D.C. Cir. 2022).  A document is deliberative if "it reflects the give-and-take of the consultative process."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  Together, the two requirements delineate between documents that set out a final agency decision and documents meant to help the agency develop its position by expressing just the author's opinion.  *See Sierra Club*, 141 S. Ct. at 786; *Coastal States*, 617 F.2d at 866.

The Court is only reviewing two sets of ICE's Exemption 5 claims in this Opinion.  The first set is comprised of two "documents that ICE describes as draft documents but whose file names include the word 'final.'"  *Advancement Project*, 549 F. Supp. 3d at 140–41; ICE *Vaughn* Index at 92–94 (record number 2019-ICLI-00015-265-66); *id.* at 124–26 (record number 2019-ICLI-00015-428-44).  The second set is comprised of "a pair of briefing documents."

*Advancement Project*, 549 F. Supp. 3d at 141; ICE *Vaughn* Index at 25–27 (record number 2019-ICLI-00015-406-19); *id.* at 122–24 (record number 2019-ICLI-00015-426).

      *a.  First Set: record numbers 2019-ICLI-00015-265-66 and 2019-ICLI-00015-428-44*

      ICE had initially provided no information to rebut the apparently final nature of the documents labelled "final."  ICE *Vaughn* Index at 92–94 (record number 2019-ICLI-00015-265-66); *id.* at 124–26 (record number 2019-ICLI-00015-428-44); *Advancement Project*, 549 F. Supp. 3d at 140–41.  At first, ICE only stated that the documents labelled "final" were "deliberative and pre-decisional as evidenced by the parent e-mail where the ICE ERO AD specifically seeks review and clearance by ICE OPLA and the ICE Office of Public Affairs."  ICE *Vaughn* Index at 93.  The Court noted, however, that Exemption 5 could cover these documents if they were "recommendations that 'died on the vine' without securing decisionmakers' approval."  *Advancement Project*, 549 F. Supp. 3d at 140–141.  ICE has now claimed that these documents "died on the vine."  Defs.' Mot. at 22.  ICE explains, "[T]wo of the countries referenced in these White Papers and informational memo were not included in the September 2017 Visa Sanction announcement."  Defs.' Mot. at 12; 2d Pineiro Decl. ¶ 19.  When recommendations have "died on the vine," then "'[c]ourts should be wary of interfering' with drafts that 'do not ripen into agency decisions.'"  *Sierra Club, Inc.*, 141 S. Ct. at 788 (quoting *Sears*, 421 U.S. at 151, n.18)).

      These documents are predecisional and deliberative.  Documents that reflect ideas that agencies ultimately decline to pursue are generally predecisional, because "documents discussing such dead-end ideas can hardly be described as reflecting the agency's chosen course."  *Id.* (citing *Sears*, 421 U.S. at 150–151).  In this case, the documents ICE is withholding proposed sanctioning two countries that ICE ultimately decided not to sanction.  Defs.' Mot. at 22; 2d

Pineiro Decl. ¶ 19.  Similarly, when "[f]urther consultation" prompts an agency "to alter key features of its . . . proposal," the prior "recommendations were thus part of a deliberative process . . . ." *Sierra Club, Inc.*, 141 S. Ct. at 788.  In this case, ICE claims that the documents were "marked as 'draft'" (though the file names say "final") and "were sent from an ICE ERO employee to ICE's Chief of Staff."  2d Pineiro Decl. ¶ 17.  Judging by the difference between the draft and final versions, deliberation evidently caused the agency to alter key features of the proposal.  Therefore, Exemption 5 properly covers these documents.  *See Sierra Club*, 141 S. Ct. at 788.

But that does not end the analysis.  Even if a record is exempt, agencies have the duty to segregate, or release, non-exempt portions of exempt records.  "FOIA mandates that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'"  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 11-cv-945, 2012 WL 13214276, at *1 (D.D.C. May 11, 2012) (quoting 5 U.S.C. § 552(b)).  "It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."  *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  To that end, an agency "must include 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'"  *Elec. Priv. Info. Ctr.*, 2012 WL 13214276, at *2 (quoting *King v. U.S. Dep't of Just.*, 830 F.2d 210, 224 (D.C. Cir. 1987)).  An agency is presumed to have complied with the segregability requirement unless the FOIA requester points to evidence indicating otherwise.  *Sussman*, 494 F.3d at 1117.  In that case, the agency bears the burden of showing that it has not withheld any segregable, nonexempt portions.  *Id.*

Here, the two withheld records consist of "six White Papers, and [an] additional draft White Paper."  2d Pineiro Decl. ¶ 17.  The Project claims, "ICE has withheld entire documents, not just the recommendation portions which it has identified that were never implemented."  Pl.'s Reply at 3.  It may have a point.  The document titles in the ICE *Vaughn* Index, "Cambodia story – final.docx," ICE *Vaughn* Index at 92, "SIERRA LEONE – final (08022017).docx," *id.* at 124, "ERITREA – final (08022017).docx," *id.*, "GUINEA – final (08022017).docx," *id.*, "Iran story – final (08022017).docx," *id.*, "Burma story – final (08022017).docx," *id.* at 124–25, and "Information Memo Visa Sanctions – final (08022017).docx," *id.* at 125, would appear to suggest that the documents are country-specific, making it easy to separate out the information that concerns the two countries omitted from the final announcement, 2d Pineiro Decl. ¶ 19.  This may well not be the case, but in the face of what appears to be contrary evidence, ICE must say more.  *See Elec. Priv. Info. Ctr.*, 2012 WL 13214276, at *2 (segregability analysis insufficient where DHS had not "specifie[d] why the material at issue cannot be segregated," had "provide[d] no factual support to justify the withholding," and "merely represent[ed] that documents have been reviewed for segregable material").  In order to assist the Court's segregability analysis, ICE shall produce these documents for *in camera* review.

     *b.  Second set: record numbers 2019-ICLI-00015-406-19 and 2019-ICLI-00015-424-26*

The second set of records consist of a pair of briefing documents, concerning, respectively, preparations for ICE's Acting Director's visit to the border, and "'internal talking points' on 'a number of ICE initiatives' [that were] 'part of a briefing book for the Secretary of Homeland Security's nomination.'"  ICE *Vaughn* Index at 25–27, 122–24; *Advancement Project*, 549 F. Supp. 3d at 141.  Previously, ICE was not clear about how these documents had been "prepared in order to assist an agency decisionmaker in arriving at his decision . . . ."

*Advancement Project*, 549 F. Supp. 3d at 141 (quoting *Petroleum Info. Corp.*, 976 F.2d at 1434). With respect to the border visit document, ICE initially claimed that the "briefing materials pre-date[d] the [Yuma] visit and reflect[ed] the drafter's opinions and analysis." ICE *Vaughn* Index at 25. Now, ICE has clarified that "the briefing materials inform[ed] the Acting Director's judgment in the determination of the manner and prioritization of the issues to be presented," and "[t]hese decisions shape the agency's policy." 2d Pineiro Decl. ¶ 11. The materials were "pre-decisional, inasmuch as they preceded the Acting Director's meetings with President Trump," and they were "deliberative because they reflect consultative processes and options discussed in the records are selective in nature and which highlight ongoing actions and/or efforts that were deemed pertinent to assist with the Acting Director's travel preparation and anticipated meeting preparation with former President Trump." *Id.* ¶ 12. ICE has now shown that the documents were "prepared in order to assist an agency decisionmaker in arriving at his decision," *Advancement Project*, 549 F. Supp. 3d at 141 (citation omitted), and so they are properly covered by Exemption 5.

Similarly, ICE has now provided sufficient explanation for the internal talking points. "[I]nternal talking points fall within the scope of the deliberative process privilege and FOIA Exemption 5." *Watkins Law & Advocacy, PLLC v. U.S. Dep't of Veterans Affairs*, 412 F. Supp. 3d 98, 122 (D.D.C. 2019). "[T]alking points are both predecisional and deliberative because they reflect unadopted recommendations to superiors prior to an event, such as a congressional testimony." *Id.* Initially, ICE claimed only that the "talking points [were] marked as 'pre-decisional' and are being used as preparation as part of a briefing book for the Secretary of Homeland Security's nomination." ICE *Vaughn* Index at 122. The Court held that "[h]ow those documents 'bear on the formulation or exercise of agency policy-oriented judgment' [was] not

obvious" from the *Vaughn* index.  *Advancement Project*, 549 F. Supp. 3d at 141.  ICE has now clarified this connection, explaining that the "draft talking points are also deliberative because they reveal the drafter's opinions on important topics currently in ICE's portfolio, to include ongoing operations and recalcitrant countries, and focus on presenting this information to the Secretary in order to respond to any potential questions that may arise during the nomination hearing."  2d Pineiro Decl. ¶ 21.  *Cf. Jud. Watch, Inc. v. U.S. Dep't of State*, 650 F. Supp. 2d 28, 34 (D.D.C. 2009) (holding that "notes taken in preparation for a congressional hearing on the basis that the notes are covered by the deliberative process privilege and thus Exemption (b)(5)").  Thus, the internal talking points are also properly covered by Exemption 5.

ICE has also shown that it has adequately conducted a segregability analysis with respect to the second set of records.  The Project has not disputed the adequacy of ICE's segregability analysis with regard to this set of records.  While there is some factual material in the second set of records (*e.g.*, information about "staffing levels" in the briefing materials for the border visit, ICE *Vaughn* Index at 25), "facts that are inextricably intertwined with the opinions and legal conclusions included in the document are exempt."  *N.Y.C. Apparel FZE v. U.S. Customs & Border Prot.*, 484 F. Supp. 2d 77, 98 (D.D.C. 2007) (quoting S*uzhou Yuanda Enter. v. U.S. Customs & Border Prot.*, 404 F. Supp. 2d 9, 13 (D.D.C. 2005); *see also Montrose Chem. Corp. v. Train*, 491 F.2d 63, 68 (D.C. Cir. 1974) (finding that "prob[ing] the summaries of record evidence would be the same as probing the decision-making process itself," because "requir[ing] disclosure of the summaries would result in publication of the evaluation and analysis of the multitudinous facts made by the Administrator's aides and in turn studied by him in making his decision").  "[G]iven the presumption in the agency's favor and the detail of its *Vaughn* index, ICE's representations about segregability are enough."  *Advancement Project*, 549 F. Supp. 3d at

148 (citing *Abdelfattah v. U.S. Immigr. & Customs Enf't*, 851 F. Supp. 2d 141, 146 (D.D.C. 2012)).

### B. State

State's withholdings are before this Court for the first time.  The Project only challenges State's withholdings under Exemption 5 and Exemption 7(E).  Pl.'s Mot. at 9.  The Court will consider each in turn.

#### 1.  Exemption 5

State withheld very little under Exemption 5.  State "withheld a total of three sentences from two cables comprising an assessment of certain Guinean officials regarding repatriation and removal issues and are meant to provide candid and potentially sensitive analysis to inform the Department's deliberations regarding next steps," and State also "withheld a parenthetical comment providing candid and potentially sensitive analysis to inform the Department's next diplomatic steps regarding Cambodian officials."  Defs.' Reply at 1–2 (citing Defs.' Mot. at 18–19).  According to State, the withheld information from the two cables relating to Guinea "comprise post's thoughts and analysis on certain Guinean officials' approach, priorities, and level of engagement on repatriation and removal issues," and this "commentary is meant to provide candid and potentially sensitive analysis and insight from Embassy Conakry for the purposes of informing State Department Headquarters' deliberations with respect to next steps to be taken on the issues discussed in the cable."  State *Vaughn* Index at 1.  The withheld information related to Cambodia "comprises specific background information chosen for inclusion by the Embassy in order to provide candid and potentially sensitive analysis and insight from Embassy Phnom Penh," and this withheld "parenthetical comment was meant to provide candid and potentially sensitive analysis and insight from Embassy Asmara for the purposes of

informing State Department Headquarters' deliberations with respect to next steps to be taken on the issues discussed by State Department and Cambodian officials." *Id.* at 5.

State has properly withheld this information under Exemption 5 because it is both predecisional and deliberative. Although Guinea and Cambodia were both on the sanctions press release, these documents are "pre-decisional and deliberative with respect to further engagement with the [respective governments] on repatriation and removal issues." State *Vaughn* Index at 1. The withheld information is predecisional because it "precede[d]—[was] predecisional to—the actual determination of how best both to define the scope and contours of the new policy," *Campaign Legal Ctr.*, 34 F.4th at 24, namely, "further engagement with the [respective governments] on repatriation and removal issues," State *Vaughn* Index at 1.[5] The withheld information is deliberative because it contained State's "analyses informing next steps in the Department's diplomatic efforts." Defs.' Reply at 4 (citing State *Vaughn* Index at 1, 5). These analyses "reflect[] the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). These redacted sentences "reflect[] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 785 (citation omitted). Therefore, State properly withheld them under Exemption 5.

The Project argues that the documents are not deliberative because the relevant actions were mandated by law and did not allow discretion. Pl.'s Cross-Mot. at 17–18. Under this

---

[5] The Project and State disagree as to whether the Project had waived its right to challenge State's Exemption 5 withholdings when State separately justified its withholding under both Exemption 5 and Exemption 1, because the Project declined to challenge any of State's withholdings under Exemption 1. *See* Defs.' Reply at 2; Pl.'s Reply at 4–5. Because all of State's redactions under Exemption 5 were proper, there is no need for the Court to reach this question.

Circuit, "to be protected under Exemption 5, the kind and scope of discretion involved must be of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberations in the future." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1436 n.8 (D.C. Cir. 1992). But the Project misses the point. The Project argues State lacks discretion regarding whether or not to discontinue granting visas, but State's withholdings do not relate to the granting of visas—rather, they relate to "next steps" once the non-discretionary decision to discontinue visas was already made through the visa sanctions press release. *See* Defs.' Reply at 4 (citing State *Vaughn* Index at 1, 5).[6] Thus, State's "analyses informing next steps in the Department's diplomatic efforts," *id.*, are properly covered by Exemption 5.

### 2.  Exemption 7(E)

Exemption 7(E) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C.

---

[6] The Project points to Section 243(d) of the Immigration and Nationality Act to argue that the Secretary of State lacks discretion. Pl.'s Cross-Mot. at 18; 8 U.S.C. § 1253(d). But as State explained, "the cables followed diplomatic discussions with foreign officials regarding the repatriation of removed nationals and the redacted portions contain analyses informing *next steps* in the Department's diplomatic efforts." Defs.' Reply at 4 (emphasis added) (citing State *Vaughn* Index at 1, 5). It would be fatuous to suggest that the statute made State's negotiations with foreign governments entirely non-discretionary. Diplomatic communications with foreign governments must obviously and necessarily involve some level of discretion. *Cf. Am. Int'l Grp., Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 450 (D.C. Cir. 1981) ("[C]ongressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." (quoting *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936))).

§ 552(b)(7)(E).  A record must therefore meet three requirements to qualify for the exemption: (1) it must be "compiled for law enforcement purposes"; (2) the release of the record must disclose techniques, procedures, or guidelines used for law enforcement investigations or prosecutions; and (3) it must be that the disclosure of those techniques, procedures, or guidelines "could reasonably be expected to risk circumvention of the law."  *See Advancement Project*, 549 F. Supp. 3d at 142.[7]

State withheld portions of five cables under Exemption 7(E).  The information concerned discontinuance of the issuance of certain visas.  State *Vaughn* Index at 2–3.  The withheld material describes "specific law enforcement techniques and procedures used by the Department to process and adjudicate an alien's eligibility for a visa."  *Id.*  The omitted information "also reveal[s] which specific information is omitted or included in the 'Consolidated Consular Database' ('CCD')[,] . . . a non-public law enforcement database used to administer and enforce U.S. immigration laws and to prevent and track fraud."  *Id.*

a.  *Were the Withheld Records Compiled for Law Enforcement Purposes?*

State must first show that the records it withheld were compiled for law enforcement purposes.  Evaluating whether it has made that showing begins with classifying the agency.  An agency whose "principal function is law enforcement" is entitled to deference when it claims that

---

[7] According to D.C. Circuit caselaw, an Exemption 7(E) claimant must show a risk of circumvention of the law regardless of whether a law enforcement technique, procedure, or guideline is at stake.  *See PEER*, 740 F.3d at 204 n.4 (remarking that, unlike the Second Circuit, the D.C. Circuit has applied the "risk of circumvention" requirement to techniques and procedures in addition to guidelines).

In addition, the "could reasonably be expected to risk" language supplants the FOIA Improvement Act's general requirement that an agency must disclose records unless it is reasonably foreseeable that disclosure would harm the interest the claimed exemption protects. *See Reps. Comm. for Freedom of the Press v. FBI*, 548 F. Supp. 3d 185, 197 & n.2 (D.D.C. 2021); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 525 F. Supp. 3d 181, 192 & n.4 (D.D.C. 2021).

records were compiled for law enforcement purposes.  *See PEER*, 740 F.3d at 203.  An agency with "mixed law enforcement and administrative functions," however, must describe the records with enough specificity to satisfy a skeptical court's scrutiny.  *Id.*; *see also Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982) (when dealing with "a mixed-function agency," "a court must scrutinize with some skepticism the particular purpose claimed for disputed documents").  Here, State is a mixed-function agency.  *See Schoenman v. FBI*, 573 F. Supp. 2d 119, 146 (D.D.C. 2008) ("[T]he State Department is a mixed-function, rather than strictly law enforcement, agency . . . .").  Therefore, the Court "must scrutinize with some skepticism the particular purpose claimed for [the] disputed documents" that State asserts are covered by Exemption 7(E).  *Pratt*, 673 F.2d at 418.[8]

The core of the first requirement hinges on whether State compiled the specific documents at issue for law enforcement purposes.  "The threshold requirement for qualifying under Exemption 7 turns on the purpose for which the document sought to be withheld was prepared."  *FBI v. Abramson*, 456 U.S. 615, 624 (1982).  A record is deemed "compiled for a law enforcement purpose" so long as there is (1) a rational "nexus" between the record and the agency's law enforcement duties and (2) a connection between the subject of the record and a possible security risk or violation of federal law.  *Long v. ICE*, 149 F. Supp. 3d 39, 48–49 (D.D.C. 2015) (citations omitted).  "The term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal," *PEER*, 740 F.3d at 203, and "mixed function . . . agencies that have both civil and criminal enforcement duties still can invoke

---

[8] The Project appears to argue that because State is a mixed-function agency, it could never invoke Exemption 7(E), but there is no caselaw to support such a proposition.  To the contrary, it is settled law that "[t]he term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal."  *PEER*, 740 F.3d at 203.

Exemption 7 as long as they compiled the records for law enforcement purposes," *Lewis v. U.S. Dep't of the Treasury*, No. 17-cv-0943, 2020 WL 1667656, at *3 (D.D.C. Apr. 3, 2020) (citing *PEER*, 740 F.3d at 203), *aff'd*, 851 F. App'x 214 (D.C. Cir. 2021).

Here, the database information plainly serves a law enforcement purpose.  According to the State, the CCD database is "a restricted law enforcement database that serves as a repository for collected national security and criminal investigative information."  Stein Decl. ¶ 33.  The database allows State "to administer and enforce U.S. immigration laws and to prevent and track fraud."  State *Vaughn* Index at 2–3.  Courts have routinely found that similar immigration databases serve a law enforcement purpose.  *See, e.g.*, *Mezerhane de Schnapp v. USCIS*, 67 F. Supp. 3d 95, 100–01 (D.D.C. 2014) (finding that information related to a USCIS database "was compiled for law enforcement purposes"); *Long*, 149 F. Supp. 3d at 49 (finding that withheld information related to two databases used "to assist ICE and CBP with deporting people who are unlawfully in the United States, to arrest those who violate federal immigration laws, and to track investigations and court proceedings of those apprehended . . . easily qualify as records or information 'compiled for law enforcement purposes'").

Whether the State guidance on visa *adjudication* satisfies a law enforcement purpose, however, is a closer question.  The Court is not aware of a Circuit decision on this precise issue.  Nonetheless, the Court finds that the visa adjudication information in this case qualifies for a law enforcement purpose.  In this Circuit, an "administrative determination" of one's "[]eligibility" possesses the "salient characteristics of 'law enforcement' contemplated by the wording of exemption 7."  *Ctr. for Nat. Pol'y Rev. on Race & Urb. Issues v. Weinberger*, 502 F.2d 370, 373 (D.C. Cir. 1974).  Thus, in *Weinberger*, the D.C. Circuit held that an agency's adjudicative files regarding public schools' segregation and discrimination practices served law enforcement

purposes under Exemption 7. *Id.* Moreover, courts in this Circuit have found that information about how an agency adjudicates immigration cases satisfies a law enforcement purpose. *See, e.g.*, *Gosen v. USCIS*, 75 F. Supp. 3d 279, 290 (D.D.C. 2014) (finding that "details about how USCIS processes asylum cases" was "precisely the type[] of information contemplated by the exemption" (internal quotation marks and citation omitted)); *Techserve All. v. Napolitano*, 803 F. Supp. 2d 16, 29 (D.D.C. 2011) (finding Exemption 7(E) applicable to details about how USCIS processes H-1B petitions).

Furthermore, courts outside the D.C. Circuit have explicitly stated that Exemption 7(E) can apply to the State visa adjudication process. For example, the Second Circuit has ruled that State's "visa adjudication" information satisfied a law enforcement purpose under Exemption 7(E). *Knight First Amendment Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.* (*"Knight II"*), 30 F.4th 318, 328 (2d Cir. 2022). Observing that "[e]nforcing the law always requires a degree of analysis and application," the Second Circuit held that the visa adjudication information at issue in that case satisfied a law enforcement purpose because it related to the detection of terrorism. *Id.*; *see also Nikaj v. U.S. Dep't of State*, No. 18-cv-496, 2019 WL 2602520, at *3 (W.D. Wash. June 25, 2019) ("The Government's determination about whether visa applications should be approved or denied, pursuant to U.S. immigration laws, is an administrative determination that has the "salient characteristics of 'law enforcement contemplated.'" (quoting *Weinberger*, 502 F.2d at 371)).

Here, State has explained that its guidance "serves the law enforcement purposes of adjudicating visas in accordance with the INA, as well as implementation of visa suspension measures taken in response to particular countries' recalcitrance in accepting their nationals who are subject to final orders of removal from the United States." Stein Decl. ¶ 31. In particular,

the guidance helps State determine "exceptions to the visa suspension measures" as part of its duty to enforce the "visa suspension actions" announced in the press release. *Id.* ¶ 33. This information was produced by a division of State that "serves as a liaison with the Department of Homeland Security and other U.S. Government agencies with a role in administration and enforcement of U.S. immigration laws." *Id.* ¶ 31. Like the agency in *Techserve Alliance* that "collaborate[d] with other agencies . . . to prevent immigration fraud," here State's adjudicatory guidance helps the agency to prevent "fraudulently obtain[ed] visas" in furtherance of its enforcement of immigration laws alongside other U.S. agencies. Defs.' Mot. at 20–21. And like the visa adjudication information in *Knight II*, the information here was "compiled to provide comprehensive guidance to employees in the field on how to apply and enforce the laws within the agency's purview." 30 F.4th at 328. Thus, both the CCD database information and State's guidance satisfy Exemption 7(E)'s threshold requirement of a law enforcement purpose.

### b. Would the Withheld Information Disclose Law Enforcement Techniques, Procedures, or Guidelines?

Having established that the documents were compiled for law enforcement purposes, State must now show that their release would disclose law enforcement techniques, procedures, or guidelines. Exemption 7(E) "does not ordinarily protect 'routine techniques and procedures already well known to the public.'" *Elec. Frontier Found. v. Dep't of Just.*, 384 F. Supp. 3d 1, 9–10 (D.D.C. 2019) (quoting *Founding Church of Scientology of Wash., D.C. v. NSA*, 610 F.2d 824, 832 n.67 (D.C. Cir. 1979)). But it does cover the "confidential details" of techniques, procedures, and guidelines even when their "general contours [are] publicly known." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1112 (D.C. Cir. 2007) (citing *Blanton v. Dep't of Just.*, 64 F. App'x 787, 788–89 (D.C. Cir. 2003) (per curiam)); *see also Shapiro v. U.S. Dep't of Just.*, 893 F.3d 796, 801 (D.C. Cir. 2018).

Here, State has cleared this bar for both the State guidance and CCD database information.  With respect to the guidance, State asserts that the withheld information "comprises specific guidance to consular officers concerning the internal processing and adjudication of visa applications."  State *Vaughn* Index at 2–3.  Their very nature—as guidelines—means that disclosure would reveal State's "guidelines for law enforcement."  5 U.S.C. § 552(b)(7)(E).  With respect to the CCD database information, State avers that "disclosure of the withheld instructions to consular officers would also reveal which specific information is omitted or included in the 'Consolidated Consular Database' ('CCD')," "a non-public law enforcement database used to administer and enforce U.S. immigration laws and to prevent and track fraud."  State *Vaughn* Index at 2–3.  Disclosure of the database information would reveal law enforcement techniques and procedures.  *See Blackwell*, 646 F.3d at 42 (holding that Exemption 7(E) applied to an agency's "methods of data collection, organization and presentation"); *Elec. Priv. Info. Ctr.*, 248 F. Supp. 3d at 15, 17, 19 (finding that releasing documents relating to the defendant's Analytical Framework for Intelligence system, which "aids in the enforcement of customs and immigration laws . . . would disclose techniques, procedures, or guidelines" (citations omitted)).  Finally, the Project does not claim that any of this information would reveal "routine techniques and procedures already well known to the public."  *Elec. Frontier Found.*, 384 F. Supp. 3d at 9 (citation omitted).  Thus, State has shown that the withheld information would disclose law enforcement techniques, procedures, or guidelines.

### c.  Could Disclosure Risk Circumvention of the Law?

Exemption 7(E)'s last requirement is that disclosure of information about the law enforcement technique, procedure, or guideline "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  "D.C. Circuit precedent 'sets a relatively

low bar for the agency to justify withholding' information under Exemption 7(E)." *Skinner v.*

*U.S. Dep't of Just.*, 806 F. Supp. 2d 105, 116 (D.D.C. 2011) (quoting *Blackwell v. FBI*, 646 F.3d

37, 42 (D.C. Cir. 2011)).  Exemption 7(E)

> allows for withholding information . . . "not just for circumvention of the law, but for a
> risk of circumvention; not just for an actual or certain risk of circumvention, but for an
> expected risk; not just for an undeniably or universally expected risk, but for a
> reasonably expected risk; and not just for certitude of a reasonably expected risk, but for
> the chance of a reasonably expected risk."

*Id.* (quoting *Blackwell*, 646 F.3d at 42).  All an agency must do is "demonstrate[] logically how

the release of [the requested] information might create a risk of circumvention of the law."

*Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009) (alterations in original) (quoting

*PHE, Inc. v. Dep't of Just.*, 983 F.2d 248, 251 (D.C. Cir. 1993)).

    State has cleared the "relatively low bar" set by the third requirement.  *See Blackwell*,

646 F.3d at 42.  State claims that releasing the visa adjudication guidance "would allow

applicants seeking to fraudulently obtain U.S. visas to tailor their applications in a manner that

enhances their chances of success" and "could assist individuals seeking to circumvent the

procedures used for adjudicating visas and could reasonably be expected to risk circumvention of

the law."  State *Vaughn* Index at 2–3.  Likewise, releasing the CCD database information would

expose "technical details of how visa applications are tracked and processed in the CCD" to

"criminals seeking to access CCD information."  Defs.' Mot. at 21. "It makes sense that

wrongdoers could misuse [this] information."  *Reporters Comm. for Freedom of the Press v.*

*FBI*, 548 F. Supp. 3d 185, 200 (D.D.C. 2021).  In *Mezerhane Gosen*, the court noted that the

"logic is relatively simple"—"there is little doubt that the withheld information could enlighten

asylum applicants with criminal backgrounds about what sort of law enforcement information

(from which databases) is consulted by USCIS during adjudication of a pending asylum

application—and, of course, by logical inference, what sort of information is not consulted." 75

F. Supp. 3d at 291 (internal quotation marks and citation omitted).  So too here, in the visa

application context.  Therefore, State has "demonstrate[d] logically how the release of [the

requested] information might create a risk of circumvention of the law."  *Mayer Brown*, 562 F.3d

at 1194 (quoting *PHE, Inc.*, 983 F.2d at 251).

The Project's cases to the contrary miss the mark.  It relies on *Knight First Amendment*

*Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.* (*"Knight I"*), 407 F. Supp. 3d 311

(S.D.N.Y. 2019), for the proposition that disclosure of the withheld documents would not risk

circumvention of the law because it would merely "explain[] to the public what may constitute

grounds for admissibility."  Pls.' Cross-Mot. at 15.  But *Knight I*'s holding on this point was

overturned by the Second Circuit, which found that release would allow a potential lawbreaker to

"better tailor his or her application to avoid detection."  *Knight II*, 30 F.4th at 334–35.  Likewise,

in this case, release of this information "would both allow applicants to game the system and aid

criminals seeking unauthorized access."  Defs.' Reply at 6.  The Project also cites *Island Film,*

*S.A. v. Dep't of the Treasury*, 869 F. Supp. 2d 123 (D.D.C. 2012).  In that case, the court ruled

that the Department of Treasury did not properly withhold documents related to its database,

because the government "merely recite[d] the language of the exemption."  *Island Film, S.A.*,

869 F. Supp. 2d at 138.  The State *Vaughn* index, however, is not a mere recitation of the statute;

it explains that "[t]he withheld sentences reveal information about specific law enforcement

techniques and procedures used by the Department to process and adjudicate an alien's eligibility

for a visa, both generally and with respect to the specific visa suspension actions taken in

the . . . countries at issue in the documents," including "specific guidance to consular officers

concerning the internal processing and adjudication of visa applications, which if revealed would

allow applicants seeking to fraudulently obtain U.S. visas to tailor their application in a manner that enhances their chances of success." State *Vaughn* Index at 3.  State has provided sufficient specificity to properly withhold the documents pursuant to Exemption 7(E).

### 3.  Segregability

State has met its segregability obligations.  It produced a detailed *Vaughn* index that describes each of the records it withheld along with corresponding exemptions.  *See* State *Vaughn* Index.  The Project describes the State *Vaughn* index as "very creditable."  Pl.'s Cross-Mot. at 7.  This Court agrees.

## V.  CONCLUSION

For the foregoing reasons, ICE's motion for summary judgment (ECF No. 64) is **GRANTED IN PART AND DENIED IN PART**, State's motion for summary judgment (ECF No. 64) is **GRANTED**, and the Project's motion for summary judgment (ECF No. 68) is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 7, 2022                                        RUDOLPH CONTRERAS
                                                                United States District Judge